**Reginald BUSH, Jr., Rita Mae Bush, and Adrienne Ingrid Bush, Plaintiffs,**

v.

**Frank A. KAIM and Carolyn Kaim, Defendants.**

No. C 69–32.

United States District Court

N. D. Ohio, E. D.

Feb. 5, 1969.

Byron S. Krantz, Samuel S. Perry and Carl J. Character, Cleveland, Ohio, for plaintiffs.

Paul P. Chalko, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

LAMBROS, District Judge:

This is a civil action arising under the Civil Rights Act of 1866, Title 42, U.S. C.A. § 1982. The Court has heretofore granted a temporary restraining order against the defendants and has conducted an evidentiary hearing on the plaintiffs' motion for a preliminary injunction. Upon the evidence adduced at that hearing, the Court makes the following determination:

The plaintiffs, Reginald Bush, Jr., and Rita Mae Bush, are husband and wife; they are negroes; they have a four-month old daughter, Adrienne Bush.

Mr. Bush has recently been employed by the Mead-Johnson Laboratories as a medical sales representative. In connection with this employment, he was required to relocate in or near Cleveland, Ohio.

In order to secure suitable housing for himself and his family, he came to Cleveland on or about October 21, 1968. A friend suggested to him that if he were looking for a place to live, he should contact "Operation Equality."

"Operation Equality" is a non-profit corporation which attempts to help minority groups find adequate housing. It is staffed largely by volunteer workers. It is financed by foundation grants and other charitable contributions and operates in the areas of both sales and rentals.

Mr. Bush contacted Operation Equality. He was interested primarily in renting a house, and the organization could not provide him with a suitable rental at that time.

On or about November 5, 1968, Mr. Bush returned to Cleveland, again seeking housing. He contacted Operation Equality, but secured no good leads.

He then began looking in the newspapers for rental housing. In the Cleveland Plain Dealer edition of Saturday, November 9, 1968, Mr. Bush noticed the following advertisement: "Eastlake ranch, 2-bedrm, carpeted living rm, attached garage; spotless, $150. Reference 261-2820."

A similar advertisement appeared in the Sunday edition of the Plain Dealer. In the Plain Dealer edition for Monday, November 11, 1968, an advertisement appeared, which was identical with the

others, except that the price asked had been reduced to $140.00.

The defendants, Frank A. Kaim and Carolyn Kaim, are the owners of the property which was advertised as indicated above in the Cleveland Plain Dealer. This property is a single-family house located at 813 Stevens Blvd. in Eastlake, Ohio. This is the only rental property owned by these defendants. Mr. Kaim is a real estate agent and is experienced in the rental and sale of real property.

Mr. Bush called the number indicated in the advertisement at about 6:00 p. m. on the evening of Saturday, November 9th. He spoke with Carolyn Kaim. He asked to come out and view the property. Arrangements were made for him to come out that evening. Mrs. Kaim gave him directions to reach the property.

Bush arrived at about 8:30 that evening. Mr. Kaim met him at the door and showed him through the house. During the course of this tour and after they had been through a few rooms, Mr. Kaim told Bush that he had been showing the house to a number of other people and had received part of a rental deposit from a man to whom he had shown the house that day. Kaim also stated that he had not yet had time to tell his wife about this deposit, but that he was fairly certain the people who gave him the deposit would rent the house. Bush asked Kaim to call him the next day and let him know if the house had been taken. Although Mr. Kaim agreed to call the plaintiff, he never did so.

During the course of the meeting between Kaim and Bush, Kaim asked Mr. Bush whom he worked for, and Bush told him. Mr. Kaim did not ask the size of Mr. Bush's family; he did not ask him his age; he did not ask for credit references; and he did not request Mr. Bush to fill out a rental application.

Mr. Bush became suspicious as a result of his meeting with Mr. Kaim. He called a Mrs. Talbot, who works for Operation Equality and told her what had occurred. He asked her to verify whether the house was in fact rented. She referred him to Mrs. Catherine Worley, a part-time employee of Operation Equality. Arrangements were made whereby Bush and Mrs. Worley would go out to the house on Monday to see if Bush could rent it. If they were unsuccessful, another Operation Equality volunteer would then appear at the house and attempt to rent it.

Although Mr. Bush testified that he made these arrangements "through" Mrs. Worley and that he directed the operation, it appears that these arrangements were worked out jointly by him and Mrs. Worley, and that Mrs. Worley actually contacted the other Operation Equality volunteer and organized the subsequent proceedings.

Mrs. Worley called Mrs. Joan M. Maguire, another Operation Equality volunteer. Mrs. Worley then went to the motel at which Mr. Bush was staying and picked up $50.00 in cash to be used as a deposit on the house. She kept the cash and dropped a $50.00 check drawn on Operation Equality at Mrs. Maguire's home.

She had previously, in a phone conversation, instructed Mrs. Maguire to make an appointment to rent the house the following day. Mrs. Worley, Mrs. Maguire, and Mrs. Maguire's husband are white.

On Monday morning, Mrs. Worley called Mrs. Kaim sometime between 11:00 and 12:00 a. m. Mrs. Worley asked if the house was still available for rent. Mrs. Kaim said it was. She made an appointment to come out and view the house.

Mrs. Maguire also called up and asked if the house was for rent. The woman who answered the phone stated that it was. She then made an appointment to come out and view the house.

Mrs. Worley and Mr. Bush drove out to the house on Monday afternoon. They arrived at about 1:30. Mrs. Roland, who was at that time a tenant in the house, opened the door and allowed them to enter. Soon after, Mrs. Kaim arrived.

There is a dispute over the content of the conversation that took place at the

house. The Court concludes that the conversation was essentially as follows:

Mr. Bush introduced himself and Mrs. Worley. He stated that he had come to rent the house. Mrs. Kaim told him that a number of other applications were pending for the property and that the Kaims weren't sure whether there was a deal or not. Mrs. Worley stated that Mrs. Kaim had told her over the phone that the property was still available. Mrs. Kaim answered that she was still taking all applications from persons interested in the property. Mrs. Worley asked why she had not taken an application from Mr. Bush. Mrs. Kaim said that no application from Mr. Bush was necessary, since she already had his name and phone number and could contact him.

To summarize this conversation, Mrs. Kaim declined to rent the property to Mr. Bush at that time. Mrs. Worley and Mr. Bush, unsuccessful in their attempt to rent the house, then left. They drove to the corner of the block, parked the car, and waited.

A few minutes later, Mrs. Maguire drove around the corner and proceeded to the Kaim house. She waved to Mrs. Worley and Mr. Bush as she drove by.

Mrs. Maguire was in the house for ten to fifteen minutes. Mrs. Kaim showed Mrs. Maguire around the house. Mrs. Kaim asked where Mrs. Maguire's husband worked. Mrs. Maguire told her that he worked at the Special Electric Company. Mrs. Kaim wrote this information down together with Mrs. Maguire's name. In the course of this conversation, Mrs. Maguire also told Mrs. Kaim that she had one child. Actually, she has five children.

According to Mrs. Kaim, she asked Mrs. Maguire where her checking and savings accounts were and also asked about her credit. According to Mrs. Maguire's testimony, she was not asked any questions on these subjects.

Mrs. Maguire asked if the house had been rented, and Mrs. Kaim replied that it had not. Mrs. Kaim asked Mrs. Maguire if she wanted to rent the house. Mrs. Maguire said yes. Mrs. Maguire asked Mrs. Kaim if she would accept $50.00 as deposit, and Mrs. Kaim said yes. Mrs. Maguire gave Mrs. Kaim her personal check for $50.00 which Mrs. Kaim accepted.

Mrs. Maguire then left the house, met Mrs. Worley and Mr. Bush and proceeded to the Shoregate Shopping Center, where they discussed what had happened.

The next night, Tuesday, November 12, 1968, Mrs. Maguire and her husband, Kevin Maguire, went out to the property at 813 Stevens. They met with Mr. & Mrs. Kaim. Mr. Kaim showed Mr. Maguire through the house. The Kaims and the Maguires then went into the kitchen and filled out a "Rental Application and Agreement." This was plaintiffs' exhibit 2 at the hearing. Mr. Kaim asked Mr. Maguire for a $140.00 security deposit in connection with the lease. Maguire gave Kaim $90.00 in the form of a personal check. Mr. Maguire had previously received money ($90.00) from Operation Equality to reimburse him for this payment. The $90.00, together with the $50.00 deposit which Mrs. Maguire had previously given, constituted the $140.00 security deposit, which was accepted by the Kaims.

The Kaims and the Maguires both executed the so-called "Rental Application and Agreement," which is actually a lease for the premises. Two provisions of this agreement are relevant here. Paragraph 5 provides:

"The within premises are hereby rented for a period of 12 months, commencing December 1, 1968, and this agreement shall automatically renew itself thereafter, running continuously for like periods, unless tenants shall give to the landlord not less than 30 days' written notice, prior to the expiration of the term then running, of tenants' intention to terminate said tenancy at the expiration of the then existing term, or unless the landlord shall legally notify tenant to vacate the within premises, or unless the landlord notified the tenant, by regis-

tered mail, of any change in the monthly rental or any other terms of the within agreement."

Paragraph 6 provides:

"Said premises shall be used only as a dwelling and for no other purpose; nor shall said premises or any part thereof be sublet or assigned, nor shall the number of occupants be increased, without the written consent of the landlord first had."

During the course of the conversation between the Kaims and the Maguires, Mrs. Roland, who was then the tenant, entered the kitchen. According to Mr. Maguire's testimony, Mrs. Roland asked Mr. Kaim if it was "necessary to rent to colored." Mr. Kaim answered that he could rent to whomever he wished, but if he was selling, it would be necessary to raise the price.

According to Mr. Kaim's version of this conversation, Kaim asked Maguire why he was selling the house that he then lived in. Maguire said that colored were moving into the neighborhood. Mrs. Roland then asked Mr. Kaim what a person could do when a colored person asked to buy his home. Mr. Kaim testified that he said a person could do nothing, if the negroes would pay the asking price.

On Saturday, November 30, Mr. Bush's appliances were moved into the house at 813 Stevens Blvd. The utilities had been turned on and placed in his name. On Sunday, December 1, Mr. Bush moved in.

The Maguires both testified that they were acting as "agent" for Mr. Bush in seeking to rent the premises and in signing the lease. Mrs. Maguire testified that she entered into the lease on Mr. Bush's behalf and not on her own behalf.

Mr. Maguire testified that he never represented to the Kaims that he was renting the property for himself. He also testified, however, that he never told the Kaims that he was acting for Mr. Bush or anyone other than himself.

Both Mr. & Mrs. Maguire testified that as far as they are concerned the lease belongs to Mr. Bush and that they rented it for Mr. Bush and not for themselves. Nevertheless as they themselves stated, they behaved at all times as though they were renting the property for themselves.[1]

Mr. Maguire has tendered to Mr. & Mrs. Kaim two checks, each for $140.00. One is dated November 30, 1968, and one is dated December 30, 1968. These were intended by Mr. Maguire to constitute the rent, paid in advance, for the months of December and January. Mr. Kaim has not cashed these checks and has returned them to Mr. Maguire. Mr. Bush has sent checks for $140.00 to the Maguires for rent for each of these months. Mr. Bush testified that the Maguires are holding this money for payment to Mr. Kaim.

At certain times Mr. Bush has stated that he is a "guest" of the Maguires in the house at 813 Stevens Blvd. It appears, however, that he is not a guest, but rather pays rent to the Maguires, who in turn have attempted to make rental payments under their lease to the Kaims.

Mr. Kaim, on January 10, 1969, sent a certified letter to the Maguires stating that they were in violation of their lease agreement in that they had sublet or assigned the premises without Mr. Kaim's written consent. Kaim also notified Mr. Bush that he had no right to be on the premises. He then filed suit against Bush in the Municipal Court of Willoughby, Ohio for forcible entry onto the premises.

Mr. Bush is aware of the non-assignability provision in the lease between the Maguires and the Kaims. He has never

---

1. Mrs. Worley testified that she had never met Mr. Bush prior to Sunday, November 10. Mrs. Maguire stated that she had never met Mr. Bush until after her first visit to the house on Stevens Blvd. Mr. Maguire testified that he did not meet Mr. Bush until early in December, 1968.

asked either of the Kaims for permission to live in the house.

The Kaims in their testimony sought to rebut any inference that they refused to rent to Mr. Bush solely on the basis of his race. Mrs. Kaim stated that she had been attempting to rent the property for a number of days before she spoke with Mr. Bush. She stated that she had no formal application forms, but that she took down certain information on a sheet of paper for each prospective tenant. She stated that she would ask people for their age, their place of employment, the number of persons in their family, how long they had been in the city, and how long they planned to stay.

She testified that she asked Mr. Bush what his employment was, and that he stated he was a sales representative. He also stated that he was moving to Cleveland from Washington with his wife and daughter.

Prior to speaking with Bush, Mrs. Kaim had taken six or seven "applications" to rent the property. She had mentally rejected two of the applicants as not being potentially good tenants. The other four of the six applications she took were from people who were not very interested in the property. Mr. Bush was the only negro applicant.

On November 9, at the time she first made arrangements with Mr. Bush to come and view the premises, she had not spoken with her husband all day.

Mr. Kaim arrived home at 7:30 p. m. He testified that he had shown the property to another man on Saturday afternoon and had accepted a deposit from this man to hold the property. The Kaims both testified that he told Mrs. Kaim about this when he arrived home. According to the Kaims' testimony, Mr. Kaim then tried to reach Bush, but he had already left his motel. Mr. Kaim testified that he does not remember the name of the man who gave him the deposit, and he could furnish no other information on this man's identity.

When Mr. Bush came out to the house on Saturday night, Mr. Kaim told him that he had received a deposit on the property. He told Mr. Bush that he would let him know whether the property was rented, but he did not, in fact, ever call him.

Mrs. Kaim stated that she told persons who called about the apartment on Sunday that the Kaims had accepted a deposit for the property and that there was an application pending. No one came out after being told that. On Sunday night, the person who gave the deposit called and said he did not want the property, because it was too small. Mr. Kaim returned his deposit to him on Monday.

When Mrs. Worley and Mr. Bush came out to the house, there were no applications pending to rent the property other than the ones Mrs. Kaim had received the previous week. Mrs. Kaim testified that after she talked with Mrs. Worley and Mr. Bush and before she talked with Mrs. Maguire, another woman came out to view the premises. This woman was a divorcee who had two small children, and Mrs. Kaim said that she did not think the woman could afford to pay the rent. Nevertheless she said she took a rental application.

Mrs. Kaim said that when Mrs. Maguire came out to the house, she looked like the kind of tenant that Mrs. Kaim wanted. Mrs. Maguire said that she and her husband would do their own painting and that they would keep up the yard. Mrs. Kaim said she looked like an ideal tenant. Mrs. Kaim asked Mrs. Maguire where her husband worked, where they lived, where their checking and savings accounts were, and about their credit.

After Mrs. Maguire put down a deposit, Mr. Kaim, according to his own testimony, checked to see whether they owned the house in which they were living and to see whether they had an account at the Union Commerce Bank.

The Kaims gave three reasons why they preferred the Maguires over the

Bushes. (1) They preferred an older couple, (2) they preferred a couple with no children, and (3) they preferred a tenant with good credit. Nevertheless, although the Maguires physically appear to be older than Mr. Bush, neither of the Kaims asked the Maguires or Mr. Bush what their respective ages were. In addition, Mr. Bush was not asked about his income. The Kaims made no attempt to check on his credit. Mr. Bush had one child; the Maguires represented that they had one child.

Mrs. Kaim testified that she would be "a little reluctant" to rent to a negro because of the probable feelings of the people in the neighborhood. Mr. Kaim testified that he was "somewhat apprehensive" about renting to a negro. He stated that he would consider renting to Mr. Bush even today, but that he would turn him down if he had someone who was a better qualified tenant.

Mr. Kaim stated that Mr. Bush is a presentable man and that the house is presently in good condition, although not in as good a condition as when the Rolands lived there.

The Court has studied the significant portions of the testimony of all the witnesses. The Court has concluded that the Kaims declined to rent to Mr. Bush solely for the reason that he was a negro and for no other reason. The Court has further concluded that the asserted reasons for the Kaims' refusal to rent to Mr. Bush are afterthoughts and were not considered by the Kaims at the time they rented the premises.

Mr. Kaim testified that on Saturday, November 9, when he spoke with Mr. Bush, a man had made a deposit to rent the property. Nevertheless, he was unable to produce the name of this individual or any other information with respect to his identity. In addition, although the Kaims stated that they attempted to reach Mr. Bush on Saturday evening to tell him about the deposit Kaim had received, Mr. Kaim did not mention any alleged deposit until midway through Bush's tour of the house.

The Kaims contended that they were primarily interested in an older couple with good credit. Nevertheless, they did not ask Mr. Bush for his age, he did not ask the Maguires their age. They did not inquire into Mr. Bush's credit. Furthermore, the Court has concluded that they made no inquiry into the Maguires' credit.

Although Mr. Bush expressed a willingness to lease the house at a rental of $150.00 per month, and although Mr. Kaim told Bush that he would call him if the property became available, the Kaims then advertised the property at a reduced rental and did not even call Bush before doing so.

For the above reasons among others, the Court discounts the assertions by the Kaims that they declined to rent the property to Mr. Bush for reasons other than his race. The Court has concluded that the Kaims never actually considered renting the property to Mr. Bush. The Court has further concluded that the sole basis for the refusal of the Kaims to rent the property to Bush was his color. The reasons now put forth by the Kaims to justify their refusal are afterthoughts and did not enter into their consideration at the time.

The Court finds that the Kaims were willing to lease this property at a monthly rental of $150.00, later reduced to $140.00. The plaintiff, Mr. Bush, was willing to rent the property on these terms and communicated this willingness to the defendants, both on Saturday, November 9 and on Monday, November 11. The defendants were aware of the willingness of the plaintiffs to rent the property on these terms. Nevertheless, the defendants refused to rent the property to the plaintiffs. This refusal was based solely on the plaintiffs' race and for no other reason.

This action arises under the provisions of Title 42 U.S.C.A. § 1982, the so-called Civil Rights Act of 1866.

That Act provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Plaintiffs' allege that they have been denied the "same right" to lease property guaranteed them by Section 1982 solely on the basis of their race.

The parties, in their presentation and arguments before the Court, have emphasized the legal issues relating to the rights of the parties under the lease. Plaintiffs assert that the Maguires, when they leased the house, were acting as agents for Mr. Bush, who was their undisclosed principal; that they rented the property *for* Mr. Bush; that Mr. Bush is the real lessee. Thus, the plaintiffs claim there has been no assignment of the lease in breach of paragraph six, and the plaintiff Bush is entitled to remain on the property under the provisions of the lease executed on his behalf by his agents.

The defendants assert that there has been a prohibited sublet or assignment of the lease, and that this represents a breach of the lease provisions. The defendants also assert that the lease was procured by misrepresentations made to the defendants by the Maguires—specifically, that they were renting the property for themselves, that they only had one child, and that they themselves intended to live in the house. For these reasons the defendants assert that the plaintiffs are wrongfully on the premises, have no rights under the lease, that the lease itself was procured by fraud, and that the defendants are justified in evicting the plaintiffs.

The Court does not credit the issue of the rights of the parties under the lease with the importance the parties have attributed to it. The Court has concluded that this issue is not of critical significance in this case and, indeed, may not even be relevant.

■ This case arises under Title 42 U.S.C.A. § 1982. The plaintiff, to sustain a cause of action under this section, must prove that he has been deprived of the "same right * * * to * * * lease * * * real * * * property" as is enjoyed by white citizens. He must show that he has been denied the opportunity to rent the property solely on the basis of his race. If there has been such a denial, then a cause of action under Section 1982 arises. The plaintiff acquires a right derived from Section 1982. This right is conferred by the federal law. It is not dependent on the state law of contract.

■■ The plaintiffs' cause of action, if any, is derived from the discrimination and arose at the time of the discrimination. The Court must determine the rights of the parties as of the time of the discrimination, and restore to the plaintiff that of which he has been deprived. State law issues may become applicable here, particularly as the result of intervening events, but the Court essentially must determine whether a federal right has been denied.

If the plaintiffs were denied their "right" to rent this property solely on the grounds of their race, then a cause of action exists by reason of Section 1982, and the Court must seek to restore this right to the plaintiffs. On the other hand, if no discrimination occurred, then no cause of action exists under Section 1982 and the plaintiffs' rights, if any, can be derived only from the state law contracts. Since the Court has determined that a discrimination was practiced, it does not reach the issues of the state law of contracts.

The landmark case interpreting Section 1982 is Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968). The *Jones* decision resurrected this section, which had long been regarded as insignificant and duplicative. Indeed, in seeking to interpret and apply Section 1982, the Court is without guidance from other authorities. The Court has been unable to discover

any reported decisions subsequent to Jones v. Mayer which apply Section 1982.[2] A discussion of the Jones v. Mayer case is, therefore, particularly important.

The precise issue before the Supreme Court in Jones v. Mayer was whether Section 1982 barred *all* racial discrimination, or merely discrimination which was the product of state action. The Court stated: "We hold that Section 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment."

The issue of whether Section 1982 bars private discriminations in the sale or rental of houses can no longer be debated. This issue is conclusively settled by Jones v. Mayer.

The Court also considered the relationship between Section 1982, which was the Civil Rights Act of 1866, and Title 42 U.S.C.A. § 3601 et seq., which is the so-called Fair Housing Act of 1968. The Court held that these two statutes have an independent and concurrent existence. As the Court stated in referring to the 1968 Act: "Its enactment had no effect on Section 1982 * * *." Indeed, in both the *Jones* case and the present case, the discrimination involved would not come under the provisions of the 1968 Act. In the present case, the defendants and other persons similarly situated are specifically exempt from the provisions of the 1968 Act, Title 42 U.S.C.A. § 3603(b) (1) and (c) (1). As the Supreme Court determined, however, these acts have independent significance and the exemptions in the 1968 Act are not applicable to litigation under the 1866 Act.

The Court also set forth the standard to be utilized in determining whether an individual had been deprived of rights guaranteed him under Section

1982: "So long as a Negro citizen who wants to buy or rent a home can be turned away simply because he is not white, he cannot be said to enjoy 'the *same* right * * * as is enjoyed by white citizens * * * to * * * purchase [and] lease * * * real and personal property.' 42 U.S.C., § 1982." (Emphasis is Court's.) As the Court went on to state, Section 1982 "must encompass every racially motivated refusal to sell or rent." The Court noted with approval the statement from the earlier case of Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187 (1948) that a discrimination would exist where a negro is denied the opportunity to purchase a home "solely because of [his] race and color."

The standard set forth by the Supreme Court in Jones v. Mayer is identical to the one applied for most other statutes relating to civil rights. Other courts, in seeking to determine whether a petitioner had been denied rights guaranteed him under these statutes, have looked to determine whether there was a discrimination made "on the basis of race," Cypress v. Newport News General and Non-Sectarian Hospital Assoc., 375 F.2d 648 (4th Cir. 1967); or which was the "product of racial bias," Lewis v. City of Grand Rapids, Mich., 356 F. 2d 276 (6th Cir. 1966); or was "motivated by racial considerations," Brooks v. School Dist. of the City of Moberly, Mo., 267 F.2d 733 (8th Cir. 1959); or was "based solely on account of race," Brooks v. School Dist., supra; or was made "because [plaintiff] was a negro," Lewis v. City of Grand Rapids, *supra*. See also Rolfe v. County Bd. of Ed. of Lincoln County, Tenn., 391 F.2d 77 (6th Cir. 1968).

From the above authorities, it is apparent that this Court is required to apply the following standard in the present case: An individual is denied the "same right * * * as is en-

---

2. Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968), the only

case involving Section 1982, is not relevant here.

joyed by white citizens * * * to * * * lease * * * real * * * property" if he is prevented from renting the property solely because of his race. The Court must determine in each case whether the refusal or failure on the part of the landlord or owner to rent to the plaintiff was *motivated* by racial considerations, was based *solely* on account of race, or was made *because* the plaintiff is a negro.

 In sustaining his burden for proving that there has been a prohibited discrimination under the Act, the plaintiff must show each of the following elements: (1) that the owner (or responsible party) placed the property on the open market for sale or rental, (2) that the plaintiff was willing to rent or purchase the property on the terms specified by the owner, (3) the plaintiff communicated this willingness to the owner at a time when the property was available for sale or rent, (4) that the owner refused to rent or sell the property to the plaintiff on the terms which the owner indicated would otherwise be satisfactory, and (5) that there is no apparent reason for the refusal of the defendant to rent the property to the plaintiff other than the plaintiff's race.

 The defendant may then come forward and rebut the evidence establishing any of these elements, or he may show that there were reasons other than the plaintiff's race underlying his refusal to rent to the plaintiff. Cypress v. Newport News General and Non-Sectarian Hospital Assoc., 375 F.2d 648 (4th Cir. 1967), Lewis v. City of Grand Rapids, Mich., 356 F.2d 276 (6th Cir. 1966), Rolfe v. County Bd. of Ed. of Lincoln County, Tenn., 391 F.2d 77 (6th Cir. 1968), Brooks v. School Dist. of the City of Moberly, Mo., 267 F.2d 733 (8th Cir. 1959).

 Section 1982 does not prohibit an owner from considering factors *other than* race in determining whether to sell or rent his property to a negro, or to any other person for that matter. An owner can refuse to rent or sell to anyone, negro or white, for any reason he chooses so long as the motivating reason for this decision is not the individuals race or color.

 The statute guarantees to negroes only the "same right" as is enjoyed by white citizens. It does not purport to grant to negroes rights which exceed those of white or other citizens. It provides merely that an owner may not refuse to rent to a negro solely on the basis of his race. Thus, an owner may refuse to rent to a negro for any reason he would refuse to rent to a white man. The statute merely prohibits him from refusing the negro solely because he is a negro.

 The Act does not prohibit an owner from considering any factors other than race which he feels are relevant in determining whether to rent to one individual or another. Such factors, which an owner might consider, include the credit standing of the applicant, his assets, his financial stability, his reputation in the community, his age, the size of his family, the ages of his children, his past experience as a lessee or tenant, the length of time he plans to occupy the premises, and whether he is or is not a transient.

 The owner may also consider more subjective factors in determining whether he will rent to one individual or another. Thus, he may consider the applicant's appearance, his demeanor, the owner's estimate of his trustworthiness or truthfulness or other subjective factors. Indeed, businessmen utilize such conclusions and opinions in their daily affairs.

 Although such factors are subjective, they may be considered. Nonetheless, the owner may later be called upon to demonstrate in court that these and not racial motivations were responsible for his decision in refusing to rent or sell to a negro. Subjective factors are by their nature difficult to prove and often have little more than the credibility of the individual witness behind them.

■ An owner may even refuse to' rent to an individual simply because he does not like him. No one is required to rent or sell to an individual he doesn't like. As in other cases, however, the owner may later be called upon to demonstrate in court that his personal dislike of an individual, rather than the individual's race, was responsible for his decision to refuse him as a tenant.

■ The owner may consider such factors as those set out above in determining whether to rent or sell to *any* individual. He is not precluded by Section 1982 or by any other federal statute from considering such factors. Indeed, *any* factor, other than race, which is relevant to a decision whether to rent or sell to an individual may be considered, and the list of factors set forth above is not intended to be, and could not constitute, an exclusive list.

In many cases of this nature, and in the present case, some or many of the above factors may be relevant. There will likely be individual differences between the negro plaintiff and the other applicants for the property. In the present case, for example, there is a difference in the ages of the Maguires and the Bushes. There is a possible difference in their credit and financial standing.

■ Once the plaintiff has made out a prima facie case of discrimination, the owner must come forward and show that there were other factors responsible for his decision not to rent to the plaintiff. It is not sufficient that differences between the plaintiff and other applicants exist. The owner must also show that he actually considered these other factors and used them, rather than race, as the basis for making his decision.

■ This presents primarily an evidentiary question and often an issue of credibility. The Court may consider a number of things in determining whether the owner actually utilized relevant non-racial elements in deciding whether to rent to the plaintiff as opposed to another individual: (1) Did the owner request information relevant to these subjects from the plaintiff, (2) did the owner request such information from other applicants, (3) did he secure such information from other sources, (4) did he request this information from the plaintiff and/or from the other applicants during the period in which he was selecting a tenant, (5) did the owner make any attempt to follow up on this information or to check its accuracy, (6) did he perform this follow-up or checking process during the time in which he was deciding to whom to rent, (7) were there other applicants with better or more desirable ratings in these areas than the plaintiff.

The above are some of the elements which the Court may consider in determining whether the defendant's decision not to rent to the plaintiff was racially motivated or not. There may, of course, be other factors, and the above is not an exclusive list.

■ In the present case, certain differences other than race did exist between the Bushes and the Maguires. Nevertheless, although these differences did exist, the evidence establishes that the defendants did not consider them in refusing the plaintiffs. Rather, they based their decision not to rent to the plaintiffs solely upon considerations of race.

■ The Court has concluded that the defendants' refusal to rent this property to the plaintiffs on Saturday, November 9 and Monday, November 11 was motivated solely by factors of race and for no other reason. The plaintiffs have been deprived of the rights guaranteed them under Title 42 U.S.C.A. § 1982. The Court is, therefore, called upon to fashion a preliminary order to preserve the status quo between these parties pending the outcome of this litigation and to prevent further deprivations of plaintiffs' Federally-guaranteed rights during the pendency of this litigation.

■■ This is an action seeking injunctive relief. Such an action calls upon the Court to exercise its extraordi-

nary powers. Such powers should be, and are, invoked only under extraordinary circumstances. Nonetheless, the present case is an extraordinary case. The unlawful conduct of the defendants can only be remedied by the issuance of injunctive relief. No adequate remedy at law exists; equity must respond.

The defendants urge that injunctive relief should be denied because of the methods used by the plaintiffs in obtaining a lease. Such tactics are, indeed, not to be favored. Nevertheless, had the plaintiffs not utilized such tactics to acquire possession of the premises, they would have found themselves without a remedy once the home had become occupied by another tenant who was without knowledge of the prior discrimination.

The Court, having determined that injunctive relief is required, must fashion a fair and just order. In tailoring this order, the Court seeks to prevent any further deprivations of the plaintiffs' rights under Section 1982. The Court also seeks to restore to the plaintiffs that of which they have been deprived.

The Court is also cognizant of the complexities of the landlord-tenant relationship. The Court seeks to preserve and foster, rather than to disrupt, a normal landlord-tenant relationship between the plaintiffs and the defendants.

The Court seeks to restore to the plaintiffs that of which they have been deprived. The defendants held their property out for rental under certain terms and conditions. These terms and conditions are embodied in the Rental Application and Agreement entered into between the Kaims and the Maguires. The defendants, in refusing to rent to the plaintiffs, have deprived them of the right to enter into a lease for these premises under these terms and conditions. It was a rental of the property under these terms that the Kaims held forth to the white applicants; and it is a rental of the property under these terms that they have deprived the plaintiffs.

The Court, in seeking to restore to the plaintiffs that of which they have been deprived, and to preserve the status quo pending the outcome of this litigation, will secure to plaintiffs, insofar as possible, the position which would have been enjoyed by white citizens under the same circumstances. The plaintiffs are not entitled to greater rights; neither are they entitled to lesser rights.

It is, therefore, ordered as follows:

### I

It is ordered that the defendants are restrained and enjoined from each of the following acts and activities:

1. From proceeding with Case No. 15795 in the Willoughby Municipal Court, Willoughby, Ohio.

2. From commencing any other proceedings or litigation directed toward evicting or disturbing the tenancy or peaceful possession of the plaintiffs at the property at 813 Stevens Blvd., Eastlake, Ohio.

3. From attempting in any other way to disturb the possession of the plaintiffs in the property located at 813 Stevens Blvd., Eastlake, Ohio.

It is further ordered that the defendants permit the plaintiffs to occupy the above-mentioned premises under like terms and conditions as those embodied in the Rental Application and Agreement entered into between the Kaims and Mr. & Mrs. Maguire, including paragraph five of said Agreement, which states that the premises are rented for a period of twelve months commencing December 1, 1968.

### II

The injunctions and commands contained in part I of this order are specifically conditioned upon the performance by the plaintiffs of each of the following acts:

1. The plaintiffs shall tender to the defendants on or before February 8, 1969, all rent presently in arrears for the property at 813 Stevens Blvd., Eastlake, Ohio.

2. Plaintiffs shall comply with all the terms and conditions of the Rental Application and Agreement entered into between the Kaims and the Maguires.

### III

In the event that the plaintiffs or the defendants do not live up to and comply with the terms and conditions of the Rental Application and Agreement entered into between the Kaims and the Maguires, or in the event that the plaintiffs become undesirable tenants for reasons other than their race, or in the event that either party desires to terminate the tenancy by reason of the expiration of the term specified in paragraph five of the Rental Application and Agreement, either party may apply to this Court for a modification of the order entered this date.

### IV

It is ordered that the bond required of the plaintiffs in connection with their motion for a temporary restraining order be continued and constitute a sufficient bond under the terms of this preliminary injunction.

This order shall become effective at 12:00 noon, February 5, 1969. Pursuant to the provisions of Rule 65(a) (2) of the Federal Rules of Civil Procedure, it is ordered that the plaintiffs' application for a preliminary injunction be and is hereby consolidated with the trial of this action upon the merits. This consolidation shall be subject to the request by any of the parties to this action to introduce further evidence upon the merits of this litigation. Said request is to be made within thirty days of this date. If no such request is made within thirty days, then the Court's determination and Order of this date shall become the final order terminating this action; and this Court's preliminary injunction entered this date shall constitute a permanent injunction.

This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law.