**Sylvester MADISON et al.,
Appellants,**

**v.**

**William H. JEFFERS, Appellee.**

**No. 73–1097.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 5, 1973.

Decided March 20, 1974.

Rehearing Denied May 2, 1974.

Butzner, Circuit Judge, dissented and filed opinion.

---

Ronald J. Jebaily, Florence, S. C., for appellants.

John M. Scott, Florence, S. C. (Wright, Scott, Blackwell & Powers, Florence, S. C., on brief), for appellee.

Before BUTZNER, FIELD and WIDENER, Circuit Judges.

PER CURIAM:

Sylvester Madison, his wife, and son brought this action under 42 U.S.C. §§ 1981 and 1982, and 42 U.S.C. § 3601 et seq. (Fair Housing Act of 1968), alleging that William H. Jeffers had unlawfully discriminated against them in refusing to sell land to them because they were black. The district court, sitting without a jury, heard the testimony of the witnesses *ore tenus,* in open court, found that Jeffers had taken the land off the market for income tax reasons, not race, and that the plaintiffs had not communicated a willingness to purchase at a time when the property was for sale, and dismissed the action. The crucial issue on this appeal is whether these findings of fact are clearly erroneous and require reversal under FRCP 52(a). Because the record supports the findings of the district court, we affirm.

Jeffers bought a tract of land consisting of approximately 298 acres in 1940, and known as the Home Place. He also purchased a one-third undivided interest in a nearby tract of land in the same community known as the Jeffers Place, which he owned with his father-in-law and one Brunson. Both the Home Place and the Jeffers Place are on TV Road. Jeffers began selling land from the Home Place in 1942, but the sales were sporadic until 1960, when he began selling an average of two tracts a year for the purpose of providing money to educate his five children. The years 1964 and 1971, in each of which Jeffers sold three lots, were the only years in which he had conveyed more than two lots from the Home Place.[1] Jeffers and the other co-owners also sold lots and tracts from the Jeffers Place, through Brunson as the agent, and also, in at least one instance, through Martin Real Estate Company. Jeffers had limited his sales from the Home Place each year because he had been advised, albeit erroneously, that if he sold more than five parcels a year, he would lose his right to capital gains tax status on the sales.[2] He also had an average yearly income from sources other than land sales of only $4,000, and he testified that, in addition to his capital gains status, he wanted to keep his income taxes to a minimum.

Jeffers, at the request of a niece's husband who worked for Martin Real Estate Company (Martin Co.), allowed twelve lots from the Home Place to be listed for sale with the Martin Company during 1970. Thereafter, a FOR SALE sign was placed on this property listing Martin Company as the agent, and Martin Company, from time to time, ran advertisements for sale of the property in the Florence newspaper. These advertisements were run at Martin Company's instance, and Jeffers was not consulted prior to their publication. He was not aware the advertisements were inadvertently continued in the paper after the listing contract expired July 31, 1971.

During the summer of 1971, Madison noticed the FOR SALE signs on the property and the newspaper advertisements concerning the property. On August 13, 1971, Madison contacted L. A. Tallon, an employee of Martin Company,

[1]. In 1971, there were three transfers from the Home Place, but one of them had been contracted for in 1970, a year in which no other sales were made from the Home Place. One of the 1971 conveyances was an exchange of property. In 1971, three parcels were sold from the Jeffers Place.

[2]. Jeffers' testimony is unclear as to whether he thought the five sales were from each tract, or from the Home Place and Jeffers tract combined. At any rate, the combined sales from both tracts never exceeded five in any one year, unless the sale contracted for in 1970 is counted in the year 1971. He never discussed his income tax with an attorney or accountant, rather relying on Brunson, a real estate agent.

who thereafter took Mr. and Mrs. Madison to look at the property. The Madisons expressed interest in two different lots belonging to Jeffers, but they were also interested in other land in the vicinity. Tallon was not sure what the Madisons wanted to buy, as they had also expressed interest in some lots in the area that were commercial property. Tallon did advise the Madisons that they should make a deposit if they wanted to buy, but the Madisons said they wanted to investigate the matter further, and did not make a deposit. After the Madisons left, Tallon called Jeffers to advise him of the prospective buyers, and Jeffers immediately told Tallon that he could not sell any more land because of tax reasons. Tallon did not advise Jeffers at that time that the Madisons were black, nor did Jeffers know it.

Madison did make subsequent inquiries about other available property for sale in the area; he also apparently made inquiries concerning a title check on Jeffers' land he had been shown.

On August 16, 1971, three days after their initial visit to the land with Tallon, Madison attempted to call Jeffers, who was not at home; Madison left word for Jeffers to return his call. Jeffers did return the call on the same day, and talked to Mrs. Madison. Mrs. Madison apparently asked Jeffers if he owned property adjacent to his lots with the FOR SALE sign on them, and he replied that he did not. The conversation, taken as a whole, certainly indicates that the Madisons had not specifically narrowed their search for property to lots owned by Jeffers, and Mrs. Madison testified that she was trying to find out who owned other property in the area of the Home Place. Jeffers did not tell Mrs. Madison that his property was not for sale at this time, and she did not question him as to the specific property that he owned.

The Madisons did not pursue the matter any further with either Martin Company or Jeffers until August 20, 1971. On that date, Madison told Tallon that they would buy Jeffers' land, and Tallon told Madison that Jeffers refused to sell for tax reasons. Tallon then went to see Jeffers personally. Jeffers reiterated to Tallon his refusal to sell, and Tallon informed Jeffers that the prospects were colored people; Jeffers responded that he was not prejudiced, and repeated that he would not sell "any more of it on account of tax purposes."[3]

The following day, August 21, 1971, Madison called Jeffers and asked if the reason he would not sell was because Madison was black. Jeffers responded that it was not, and again reiterated the tax reason for not selling.

The Madisons obviously concluded that Jeffers was not sincere in his refusal to sell for tax reasons, and they filed a complaint with the Department of Housing and Urban Development (HUD) on December 30, 1971, alleging that Jeffers refused to sell them land because they were black. They did not communicate with Jeffers in 1972, after his new tax year began, to see if he would then sell to them.

 The district court concluded that there was no proof of Jeffers' failure to sell because of the Madisons' race, color, religion or national origin, and found that Jeffers in fact refused to sell because of legitimate tax reasons. The record clearly shows that Jeffers consistently stated he would not sell for tax reasons, both before and after he discovered that the prospective purchasers were black. There was little or no evidence to indicate racial bias, other than the Madisons' belief that this was the reason. The record also supports the finding of the district court that the Madisons never indicated to Jeffers or

---

3. Jeffers' recollection is that he talked to Mrs. Madison on the telephone after Tallon came to see him. The time sequence followed for convenience here is that expressed by the Madisons. In all events, Jeffers did not know the Madisons were black until advised in his second conversation with Tallon, and he had refused to sell the property when he first talked to Tallon, before he knew their race.

his real estate agent a willingness to purchase the property during the time it was available for sale. The civil rights statutes as interpreted make clear that one who sells or leases real estate "[has] a right to refuse approval on any honest basis unrelated to the race of the prospective purchaser. . . ." Pughsley v. 3750 Lake Shore Drive Cooperative Building, 463 F.2d 1055, 1056 (7th Cir. 1972). See also Fred v. Kokinokos, 347 F.Supp. 942, 944 (E.D.N.Y.1972); Bush v. Kaim, 297 F.Supp. 151, 162 (N. D.Ohio 1969). Since there is substantial evidence supporting the district court's findings, we are unable to say that they are clearly erroneous.

Parenthetically, we point out that since the Madisons allege they seriously doubted Jeffers' sincerity, their case would be immeasurably stronger had they waited only two days, until after January 1, 1972, and sought to buy the land in question during a new tax year instead of filing the complaint with HUD on December 30, 1971. We also note that two tracts from the Jeffers Place were sold by Jeffers and his associates some time prior to this dispute to black families who now live on the tracts.

The other assignment of error is likewise without merit. Evidence of statements made during settlement negotiations sponsored by HUD is specifically made inadmissible by the statute, 42 U.S.C. § 3610(a).

The judgment of the district court is accordingly

Affirmed.

BUTZNER, Circuit Judge, (dissenting):

Were this case concerned only with an evaluation of the district court's findings of fact it is unlikely that I would dissent. I differ from my Brothers in the interpretation of the Civil Rights Act of 1866 [1] and the Fair Housing Act of 1968.[2] I would construe these Acts to afford relief to a black person whose offer to purchase property is rejected when the owner, having actual or imputed knowledge of the race of the prospective purchaser, withdraws the property from the market without a business or other rational purpose before the transaction can be completed in the ordinary course of trading. Cf. Smith v. Sol D. Adler Realty Co., 436 F.2d 344 (7th Cir. 1971). Viewing the statutes in this light, I would reverse for the following reasons.

### I

Undue significance has been attributed to the buyers' inability to prove that the owner had actual notice of the buyers' race before the owner told his agent that the property was withdrawn from sale. But it is not disputed that the owner's agent knew the buyers were black. I would impute this knowledge to the owner. W. Seavey, Law of Agency § 97 (1964). Stated negatively, I would not interpret the Acts to allow a person who has put his property on the market to shield himself from knowledge of the race of prospective purchasers by interposing his agent.

---

1. The Civil Rights Act of 1866 provides in part:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982 (1970).

The Act "bars all racial discrimination, private as well as public, in the sale or rental of property . . . ." Jones v. Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968).

2. Title VIII of the Civil Rights Act of 1968 [42 U.S.C. § 3601 et seq. (1970)] prohibits public and private discrimination on the basis of race in the sale of housing by private owners, real estate brokers, and financial institutions. Section 3604(a) states that it is unlawful "To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin." Section 3602(b) includes vacant residential lots in the definition of "dwelling."

## II

When a person announces withdrawal of property from the market after he, or his agent, learns that the prospective purchaser is black, I would require him to prove that withdrawal served a business or other rational purpose. Objective facts, not subjective intent, must be proved to establish business necessity under Title VII of the Civil Rights Act of 1964. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Similarly, in housing discrimination cases brought under the Civil Rights Act of 1866 and the Fair Housing Act of 1968, objective facts should be required to sustain the owner's claim of a business or other rational purpose for withdrawing property from the market. Cf. Stevens v. Dobs, Inc., 483 F.2d 82 (4th Cir. 1973). By relying on the owner's subjective intent to minimize his taxes, instead of requiring objective facts, the district court used an erroneous legal standard to undergird its finding that the owner withdrew the lots from the market because of legitimate tax reasons.

Even though tax avoidance may qualify as a business purpose, the owner's claim was not supported by objective facts. Cross-examination showed the owner had been misinformed about the tax laws and exposed the lack of a factual basis for the explanation that he was guarding against subjecting profit from the sale to taxation as ordinary income.

The owner's claim that the sale would place him in an unfavorable tax bracket was never established by disclosure of his tax returns or by sufficient data to show what tax bracket he was in and what bracket the sale would have put him in. While the record discloses the gross sale price of the lots, the owner did not reveal his costs or his estimated expenses of sale. No objective facts established his profit or its impact on his taxes. Moreover, although the owner made few sales each year, he produced no evidence that he had ever previously refused to sell to a bona fide purchaser to avoid taxes.

The owner's professed concern about even the slightest increase in his taxes is belied by the fact that after he withdrew the lots from the market, he joined his partners in selling another piece of property at a taxable profit during the tax year in question. The tax on this transaction was small, but not demonstrably smaller than the tax on the sale of the lots to the Madisons would have been on a deferred purchase plan similar to the plans used by the owner on other occasions. Newspaper advertisements of the lots, which were run before and after the owner told the agent the lots were not currently for sale, stated that terms were available.

## III

Because the owner withdrew the property from the market without proving a business or other rational purpose, I would hold that the property was on the market when the buyers made their firm offer to purchase it one week after they had inspected it. It is not unusual for prospective purchasers of real estate to defer their final decision for a reasonable time after they initially inspect the property. I think the Acts should be construed broadly enough to embrace routine transactions made in the ordinary course of dealing. Otherwise, a black purchaser must make a firm offer to purchase when he first sees the property or risk its immediate withdrawal from the market. By deferring a firm offer, the prospective purchaser—whether he be black or white—may lose the opportunity to buy because another person has bona fidely acquired the property in the meantime. The black purchaser, however, should not suffer the added risk of having the property withdrawn for an unsubstantiated reason immediately after his race is known.

## IV

Apart from the owner's refusal to sell, the record discloses other unlawful conduct. The Fair Housing Act of 1968

makes it unlawful for a person to refuse to negotiate for the sale of a residential lot because of race. 42 U.S.C. §§ 3602(b) and 3604(a) (1970).[3] The record discloses adequate proof that after the owner learned that the prospective purchasers were black persons, he flatly rejected their offer. He did not make any counter offer either to defer the sale to the next tax year or to arrange terms, as he did in other instances, that would have accommodated his professed desire to avoid taxes during the current year. I would hold that this conduct constitutes a refusal to negotiate in violation of the Act.

## V

Two other points, though minor, merit comment. It has been suggested that the Madison's case would be immeasurably stronger had they renewed their offer early in the next tax year instead of complaining to the federal government. Congress recognized the desirability of resolving complaints of housing discrimination by "conference, conciliation, and persuasion." 42 U.S.C. § 3610(a) (1970). Neither the Act nor its legislative history justifies drawing an adverse inference against the complainant because he has followed the path of conciliation that Congress has charted.

Actually, Mr. and Mrs. Madison did attempt to purchase the property in the following year at a time when the excuse of taxes was no longer available to the owner. At the conciliation meeting in May 1972, the owner was asked to sell to them. He again refused, this time complaining about their attitude. The

district court excluded this evidence. I believe its ruling was erroneous. The Fair Housing Act provides in part:

> "Nothing said or done in the course of such informal endeavors may be made public or used as evidence in a subsequent proceeding under this subchapter without the written consent of the persons concerned." 42 U.S.C. § 3610(a) (1970).

Here both parties evidenced their written consent by their pleadings. The buyer's complaint alleges the incident, and the owner's answer substantially admits it.[4]

## VI

I would not attribute to the owner an absence of racial motivation because he has sold other lots to black persons. The owner had sold, or contracted to sell, a number of lots from the tract containing the lots that Mr. and Mrs. Madison sought. All of these transactions were with white persons. From land that was nearby, but not contiguous to the property in litigation, the owner and his partners had sold numerous lots, including some to black persons. Sales to black persons from noncontiguous property afford a questionable basis for attributing an absence of racial motivation to a real estate operator who has sold lots from another piece of property only to white persons. Indeed, if any relevance could be attached to the noncontiguous sales, the geographic racial selectivity disclosed by this record suggests, rather than negates, discrimination.

---

3. *See* note 2, *supra.*

4. The buyers alleged:
 "[A] meeting was held on May 1, 1972 at which time the plaintiffs again asked to purchase the said piece of land. Again the defendant refused and this time cited the plaintiffs' 'attitude' as his reason."
 The owner answered:
 "[A]t the conference, defendant was asked to sell a lot to the complainant Sylvester

Madison which because of the complainant's attitude and trouble he had caused the defendant, as well as the fact that he had not requested to purchase the property after the first of the year, the defendant refused."
At the trial, the buyers again expressed a willingness and ability to buy the lots. The court, however, sustained an objection to a question seeking to ascertain whether the owner was willing to sell.

## ORDER DENYING REHEARING

Upon consideration of the petition for rehearing and of the suggestion for rehearing in banc, the court having been polled and less than a majority of the panel having voted for a rehearing and less than a majority of the court having voted for a rehearing in banc.

It is now ordered that the petition for rehearing and the suggestion for rehearing in banc be, and they hereby are, denied.

WINTER, CRAVEN, and BUTZNER, Circuit Judges, dissent.