**John M. DRAIN, Plaintiff,**

v.

**Jack FRIEDMAN et al., Defendants.**

**No. C 74–684.**

United States District Court,
N. D. Ohio, E. D.

July 16, 1976.

Michael Drain, Drain & Drain, Cleveland, Ohio, for plaintiff.

Stephen O'Brian, Michael Gordon, Kelly, McCann & Livingstone, Cleveland, Ohio, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

LAMBROS, District Judge.

This is a civil rights actions under 42 U.S.C. § 1982. It was tried to the Court. The plaintiff is the Administrator of the Estate of John S. Forhan and a tenant of the defendant Jack Friedman. Plaintiff claims that the defendant landlord violated the civil rights law in refusing to lease the premises to a prospective black purchaser of plaintiff's business.

Defendant, Jack Friedman (Friedman), is the owner of the Euclid-Lee building located at 14761 Euclid Avenue, East Cleveland, Ohio. Friedman is white. Since the early 1960's Friedman has made an affirmative effort through officials of the City of East Cleveland and private black economic organizations to attract and retain black tenants for the Euclid-Lee building. The building's space is allocated among fifteen stores and eighteen offices. Approximately one-third of the building is occupied by black tenants.

At the time of his death in March, 1970, John S. Forhan (Forhan) a white, leased two storefronts in the Euclid-Lee building. Each lease was for a period of five years with an option to renew for an additional five year period. Each lease provided that neither subletting nor assignment of the lease was permissible without first obtaining Friedman's written consent.

In each storefront Forhan operated a bar; Gene's Terry Tavern (Gene's) at 14711 Euclid Avenue and Tujaques Tavern (Tujaques) at 14667 Euclid Avenue. Gene's and Tujaques were managed by John Schloupt and Joe Reese respectively. Joe Reese is black.

Plaintiff assumed his responsibilities as Administrator w. w. a. in April, 1970. The two taverns constituted the principal assets of the estate; Gene's having an appraised value of $32,000 and Tujaques having an appraised value of $28,000. Upon the recommendation of the Forhan family, plaintiff retained John Schloupt to manage the taverns until such time as they could be sold. Schloupt, in turn, retained Joe Reese to run Tujaques.

In 1971 Joe Reese, through J.R. Inc., a wholly owned corporation, purchased Tujaques from the Forhan estate for the sum of $21,000. Reese financed this purchase through his own funds, a $5,000 loan from the American Automatic Vending Company and an $11,000 loan from Jack Friedman, the defendant.

Although Gene's Terry Tavern was initially a profitable enterprise for the Forhan estate, by 1972 Gene's was operating at a net loss. In July, 1972 plaintiff began advertising Gene's for sale in the Cleveland Plain Dealer. Plaintiff also placed Gene's on open listing with the Carpenter Investment Company and the DiSalvo Brokerage Company.

In response to his sale advertisements, plaintiff was contacted by several prospective buyers. As any sale of Gene's was contingent upon Friedman's approval of a new lease, sublease or assignment, plaintiff referred prospective buyers to Friedman for the purpose of determining whether Friedman would extend a lease to them. Friedman personally interviewed these buyers and screened them according to such standards as their community standing, credit rating, personal history, employment data and their personal presentation during the interview.

In 1973 Joe Reese became interested in, and attempted to purchase Gene's Terry Tavern. The purchase was to be conducted through Casbar, Inc., a co-defendant in this action. Casbar, Inc. was represented in the sale negotiations for Gene's Terry Tavern by Friedman. The financing for the purchase of Gene's was to be similar to that arranged by Reese in his purchase of Tujaques. Additionally, Reese and Friedman were to be equal shareholders in Casbar, Inc. The contemplated purchase fell through, however, upon the refusal of American Automatic Vending Company to extend a loan for the purchase of Gene's, and Reese's decision that at that time he was financially unable to consummate the sale. As Gene's further deteriorated Reese apparently abandoned any plans to purchase the tavern.

At least two others prospective purchasers interviewed by Friedman, John Patmon and Kinsey Bonneau, were black. After an interview with John Patmon, Friedman agreed to give Patmon a two year lease. However, this arrangement was apparently undesirable to Patmon. At the time Friedman interviewed Bonneau, Friedman was negotiating for the purchase of Gene's by Casbar, Inc. Friedman explained to Bonneau that at that time he was committed to another purchaser, but took Bonneau's business card and advised him that he would be considered further if the purchase fell through.

Friedman interviewed additional black and white prospective purchasers regarding the sale of Gene's, and discussed prospective purchasers with Harold Carpenter, a real estate broker. These prospective purchasers were rejected by Friedman.

In January, 1973, during the period of time that plaintiff was attempting to sell Gene's, John P. Forhan, son of the deceased John S. Forhan, and an attorney at law, travelled to Cleveland from South Bend, Indiana at the request of the plaintiff in order to discuss the operation, sale and lease of Gene's with Friedman. John P. Forhan met with Friedman on January 26 and January 27, 1973. Charles Friedman, son of the defendant Jack Friedman, was also present at these conversations. The

outcome of these discussions was reflected in a letter of January 27, 1973 from John P. Forhan to the plaintiff in which John P. Forhan wrote:

> He (Friedman) also agrees to accept any prospective buyer, including a black, who meets the criteria of "respectability" and "cooperation", meaning that under no circumstances will he give up the control factor over the building. From this point of view, he obviously holds all the cards. I can understand his concern for the building and can only hope that he is sincere about accepting a buyer.

It further appears from this letter that Friedman offered to purchase Gene's:

> [H]e will guarantee a purchase price of $15,000 after 30, 60, or 90 days if an acceptable buyer is not found within that time. He also agreed to go above $15,000 if business in Gene's looks better or by arbitration. His $15,000 is a minimum.

Finally, John P. Forhan wrote:

> After what salvage is possible there may be a basis for a discrimination suit against Friedman for damages, which I would gladly cooperate with if any recovery seems possible.

Gene's Terry Tavern was ultimately sold to Casbar, Inc., wholly owned by Friedman, on October 22, 1973 for the sum of $15,700.

Civil Rights actions pursuant to § 1982 are not new to this Court. In the case of *Bush v. Kaim*, 297 F.Supp. 151 (N.D.Ohio 1969) the Court held:

> An individual is denied the "same right . . . as is enjoyed by white citizens . . . to . . . lease . . . real . . . property" if he is prevented from renting the property solely because of his race. The Court must determine in such case whether the refusal or

failure on the part of the landlord or owner to rent to the plaintiff was *motivated* by racial considerations, was based *solely* on account of race, or was made *because* the plaintiff is a negro.[1] (Emphasis the Court's).

The Court further held:

> Section 1982 does not prohibit an owner from considering factors *other than race* in determining whether to sell or rent his property to a negro, or to any person for that matter. An owner can refuse to rent or sell to anyone, negro or white, for any reason he chooses so long as the motivating reason for this decision is not the individuals race or color. (Emphasis the Court's).

and

> The statute guarantees to negroes only the "same right" as is enjoyed by white citizens. It does not purport to grant to negroes rights which exceed those of whites or other citizens. . . . [A]n owner may refuse to rent to a negro for any reason he would refuse to rent to a white man.

The Court hastened to point out that although an owner could consider subjective as well as objective factors in his decision to rent, that the owner may later be called upon to demonstrate in Court that these factors, and not racial motivations, were responsible for his decision in refusing to rent or sell to a negro. *Bush v. Kaim, supra* at 163.

The Court is aware that its decision in *Bush v. Kaim* has recently been placed in issue by the line of cases springing from the Seventh Circuit's decision in *Smith v. Sol D. Adler Realty Co.*, 436 F.2d 344 (7th Cir. 1970). In *Smith v. Sol D. Adler Realty Co.* the Seventh Circuit held:

[1]. In *Bush v. Kaim,* the Court enumerated the following elements which the plaintiff in a § 1982 action must prove:

1. that the owner (or responsible party) placed the property on the open market for sale or rental;

2. that the plaintiff was willing to rent or purchase the property on the terms specified by the owner,

3. the plaintiff communicated this willingness to the owner at a time when the property was available for sale or rent,

4. that the owner refused to rent or sell the property to the plaintiff on the terms which the owner indicated would otherwise be satisfactory, and

5. that there is no apparent reason for the refusal of the defendant to rent the property to the plaintiff other than the plaintiff's race.

Race is an impermissible factor in an apartmental rental decision and it cannot be brushed aside because it was neither the sole reason for discrimination nor the total factor of discrimination. We find no acceptable place in the law for partial racial discrimination.

In the case of *Hughes v. Dyer*, 378 F.Supp. 1305 (W.D.Mo.1974) the District Court for the Western District of Missouri held:

> Defendant cites *Bush v. Kaim*, 297 F.Supp. 151 (N.D.Ohio 1969), to support a suggested conclusion of law that: "an owner can refuse to sell to anyone, negro or white, for any reason he chooses, so long as the motivating reason for this decision is not the individual's race or color". We do not believe that *Bush v. Kaim* may properly be read to support such broad legal conclusion. But, if it could be so read, we would not be persuaded to follow that case in light of the approval most recently given to the Seventh Circuit's opinion in *Smith v. Sol D. Adler Realty,* 436 F.2d 344 (7th Cir. 1971) by our controlling court in *Williams v. The Mathews Co.* . . . 499 F.2d 819 (8th Cir. 1974). In *Williams* the Eighth Circuit held that:
>
>> "Race is an impermissible factor in real estate transactions under both 42 U.S.C. § 1982 and 42 U.S.C. § 3604 and 'cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination'. . . .
>
> In *Sol D. Adler Realty* . . . the Seventh Circuit concluded that the district court had used "an impermissible legal standard" when it based its judgment for a defendant on the notion that a defendant could not be held liable if he had "another good reason for his refusal and [if] the racial ground was not the sole reason for the discrimination nor . . . the total factor . . . of discrimination".

The Court has reviewed the case of *Smith v. Sol D. Adler Realty Co.* and its progeny, and concludes that this line of cases is in accord with the Court's decision in *Bush v. Kaim.* In the case of *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.,* 463 F.2d 1055 (7th Cir. 1972) the Seventh Circuit stated that they had enunciated a "strict standard . . . in *Smith v. Sol D. Adler Realty Co.*". The Seventh Circuit went on to hold that:

> We recognize . . . that they (defendants) have a right to refuse approval on any honest basis unrelated to the race of the prospective purchaser or his associates".

The above decision appears to be on point with this Court's holding in *Bush v. Kaim* that:

> An owner can refuse to rent or sell to anyone, negro or white, for any reason he chooses so long as the motivating reason for this decision is not the individuals race or color . . . [A]n owner may refuse to rent to a negro for any reason he would refuse to rent to a white man.

■ The Court interprets the "strict standard" enunciated by the Seventh Circuit in *Smith v. Sol D. Adler* to be that *the motivating reason* upon which a refusal to rent or sell property is premised cannot be, in whole or in any part, racially oriented. Accord, *Bishop v. Pecsok,* Civ. No. 75–486 (N.D.Ohio, June 18, 1976). The Court considers this strict standard to be in accord with the standard laid down in *Bush v. Kaim* that:

> [T]he Court must determine in each case whether the refusal or failure on the part of the landlord or owner to rent to the plaintiff was *motivated* by racial considerations, was based *solely* on account of race, or was made *because* the plaintiff is a negro. (Emphasis the Court's).

The Court further considers this interpretation to be in accordance with the United States Supreme Court's holding in *Jones v. Alfred H. Mayer Co.,* that:

> § 1982 . . . must encompass every *racially motivated refusal* to sell or rent (Emphasis added). *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

*Smith v. Sol D. Adler* cannot be interpreted as holding that a landowner who considers

race among other pertinent factors in evaluating prospective tenants can never refuse a lease to a negro. Any prospective tenant, black or white, may so fail to satisfy the nonracial requirements of a landowner as to be refused a lease regardless of such tenant's race. See *Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir. 1975); *Madison v. Jeffers,* 494 F.2d 114 (4th Cir. 1974). To hold that a prospective negro tenant can never be refused a lease, even though a prospective white tenant would be refused a lease under the same circumstances, is to grant negroes greater rights than whites or other citizens. Such an interpretation contradicts the plain language of 42 U.S.C.A. § 1982, "All citizens  .  .  .  shall have the *same* right  .  .  .  as is enjoyed by white citizens". (Emphasis added).

■ The issue of motivation is evidentiary in nature. See, *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg., supra, Bush v. Kaim, supra.* Once the plaintiff in a § 1982 action has made out a prima facie case of discrimination in the rental of property, the owner must come forward and show that factors other than race were responsible for his decision not to extend a lease to such plaintiff. *Husbands v. Commonwealth of Pennsylvania,* 395 F.Supp. 1107 (E.D.Pa.1975). *Bush v. Kaim, supra.* This evidentiary burden amply protects the rights of the plaintiff and is no more difficult for the courts to deal with than any other. Further, in determining whether the actions of the owner are motivated by racial considerations the Court will look beyond the form of a transaction to its substance and proscribe practices which actually result in racial discrimination. See, *Boyd v. Lefrak Organization, supra.*

■ Applying the standards set forth in the foregoing discussion to the case at bar, the Court finds that the defendants have not violated 42 U.S.C.A. § 1982.

The sale of Gene's Terry Tavern was dependent upon Friedman's approval of the new tenant. The property was actually placed on the open market for rental. There were prospective tenants who manifested an interest in purchasing the bar and they communicated this intent to Friedman. However, Friedman's sole concern was to find a respectable tenant, black or white, for the Euclid-Lee building and race was not the motivating consideration in Friedman's refusal to rent to any prospective tenant. The evidence demonstrates that in the past Friedman has made affirmative efforts to solicit and obtain black tenants for the Euclid-Lee building; that the present tenancy of the Euclid-Lee building is substantially black; that Friedman refused a lease for Gene's Terry Tavern to both white and black prospective tenants; that Friedman extended a lease for Tujaques Tavern to Reese, a black, and offered a lease for Gene's Terry Tavern to John Patmon, a black; that Friedman loaned Reese part of the money necessary to finance the purchase of Tujaques Tavern, and was prepared to enter into an additional financial venture with Reese to purchase Gene's Terry Tavern. It cannot be inferred from this evidence that race was ever a motivating factor in Friedman's decision to refuse a prospective tenant a lease. To the contrary, the evidence indicates that Friedman was prepared to accept any respectable tenant who would operate the taverns in a fashion which would not be deleterious to the Euclid-Lee building.

The defendants did not violate the Civil Rights Act. The refusal to approve a sublease was not racially motivated. The refusal to approve a sublease was not a breach of contract nor an interference with business interests as asserted by plaintiff in his pendent claims. Accordingly, the Court finds for the defendants.

IT IS SO ORDERED.