**Thomas JOHNSON, and wife, Mrs. Thomas Johnson**

v.

**William L. ALBRITTON, Individually and as Trustee for Mary Louise Albritton, et al.**

**Civ. A. No. 74–161.**

United States District Court, M. D. Louisiana.

Jan. 5, 1977.

George M. Strickler, Jr., New Orleans, La., Lionel M. Schooler, Nelkin & Nelkin, Houston, Tex., for plaintiffs.

David M. Ellison, Jr., Ellison, Gary & Field, Baton Rouge, La., for defendants.

E. GORDON WEST, District Judge:

This is a civil rights action for injunctive relief and for damages incurred as a result of alleged discriminatory acts in the rental of housing. Jurisdiction is conferred upon this Court by virtue of 28 U.S.C.A. § 1343. Plaintiffs' complaint is grounded upon 42 U.S.C.A. §§ 1982, 1985, 1986, 3610, and 3612, the last two sections being §§ 810 and 812 of the Fair Housing Act of 1968. The gravamen of the complaint is that the defendants allegedly refused to lease an apartment to plaintiffs solely on the basis of the race of the plaintiffs. The plaintiffs are a racially mixed married couple. Plaintiffs also allege that defendants entered into a conspiracy to deprive them of the right to be free from racial discrimination in housing. After attempts at resolution of the matter by the Secretary of Housing and Urban Development failed, the matter was brought to trial. The evidence in this case does not support the plaintiffs' contentions.

The acts in question occurred in the Spring and Summer of 1973. Plaintiffs had previously resided in Baton Rouge, Louisiana, the city in which the acts complained of took place, but some time prior to March of 1973, had moved to Michigan. In March or April of 1973 they decided to return to Baton Rouge to seek employment. Plaintiff Barbara Johnson returned to Baton Rouge before her husband, while he concluded his employment at a Detroit hospital. On or about April 25, 1973, Mrs. Johnson filled out an application for tenancy at The Brittany Place Apartments in Baton Rouge. These apartments were and are owned and managed by the defendants. Shortly thereafter, Mrs. Johnson moved into an apartment at Brittany Place. Before doing so, she paid to defendants or their agent rent for the month of May, a pet deposit, and a security deposit. Mrs. Johnson's initial date of occupancy was May 1, 1973.

The application filled out by Mrs. Johnson required a listing of information such as credit references, employment history, and present employment. Nowhere on the application was an indication of race of the applicant requested. Defendants customarily attempted to verify information provid-

ed by applicants. In the case of the Johnsons when attempting to verify the information furnished, the defendants found that an employer listed on the application apparently did not know Mr. Johnson, or if he did, would not provide any information other than that Johnson, if he had ever been employed by him, had been "terminated." No reason was given for the termination.

Defendant Mrs. Ralph Stearns was the resident manager of Brittany Place Apartments at the time of the incidents in question. Mrs. Hallie Box was personal secretary to Mr. William L. Albritton, owner of the apartments. Mrs. Box customarily handled the supervision of the apartments from Mr. Albritton's law office, where she worked. On May 9, 1973, Thomas Johnson arrived in Baton Rouge. Previously thereto, on May 1, 1973, Mrs. Stearns had notified Mrs. Box of the fact that Mrs. Johnson's rental application did not "check out." Upon further investigation by Mrs. Box, it was learned that the business listed by Mrs. Johnson as her place of employment was a massage parlor which had twice been raided by the police in connection with investigations of prostitution activities in the Baton Rouge area. On May 10, 1973, Mrs. Box dispatched a memo to Mrs. Stearns which stated:

"5/10/73

"Memo to Mrs. Stearns:

"RE: Application & Lease Form of
Thomas and Tina Johnson.

"We are unable to approve this lease and request that you advise tenants to vacate Apartment 110 Brittany Place on or before May 31, 1973, otherwise it will be necessary for us to serve them with eviction papers.

"WLA"

The evidence in this case leads the Court to believe that at the time this memo was prepared, Mrs. Box was unaware of the fact that the Johnsons were a racially mixed couple. The reason for the notice to vacate was the fact that the information on the application was incomplete and insusceptible of verification, coupled with a legiti-mate desire to exclude as tenants those possibly connected with unlawful activities. Mr. Johnson was unemployed at all times relevant to this lawsuit, and subsequent to his arrival in Baton Rouge it was his usual practice to remain in the apartment during the day except when he would leave to bring his wife to her place of employment at AAA Massage Parlor. Shortly after Mr. Johnson's arrival, Mrs. Stearns began complaining to the Johnsons, with regularity, about loud music and unpleasant odors emanating from the apartment. The frequency with which Mrs. Stearns made these complaints is in dispute, although it is clear that those occasions were numerous. The odor, according to the evidence, emanated from scented candles burned by Mrs. Johnson for what she termed "religious purposes." Mrs. Johnson was characterized by her husband as a "devout Catholic." The noise about which Mrs. Stearns complained apparently came from the Johnsons' television or stereo. Whatever the source, it is beyond question, from the evidence presented at the trial, that loud noise and odors of some sort frequently came from the Johnsons' apartment. It is also beyond question that when asked to turn down the stereo or television Thomas Johnson always complied without visible rancor.

On the evening of June 16, 1973, the Johnsons were entertaining another couple in their apartment. Mrs. Johnson became intoxicated. During the course of the evening Mrs. Stearns knocked on the door to complain about loud music. Mr. Johnson answered the door, but Mrs. Johnson, apparently due to her intoxicated condition, slammed the door in the face of Mrs. Stearns and cursed her, whereupon Mrs. Box was summoned. Mrs. Johnson cursed Mrs. Box also, as well as two Baton Rouge City Policemen who had been called to Brittany Place on a matter unrelated to the Johnsons' party. Mr. Johnson testified that an ambulance was also on the scene and that one of the policemen mentioned that an overdose of drugs had occurred in the apartments. According to the evidence, most of the above incident transpired in the

common hallway outside the Johnsons' door, tending to cause a general disturbance among the other tenants up and down the hall.

On June 18, 1973, a letter bearing the signature of Mrs. Stearns was sent to the Johnsons, requesting that they vacate the apartment. Thereafter, eviction proceedings were commenced against the Johnsons in City Court. In chambers, Mr. Johnson agreed to vacate, and the City Judge gave him a limited time in which to do so. Defendants extended this time period as a courtesy to Mr. Johnson. At that time there was one month's rent due and owing. That rent has never been paid.

There is no question but that at all times pertinent to this lawsuit, black tenants resided in Brittany Place Apartments. There was no evidence that defendants had ever refused occupancy on account of race. In addition to this, the testimony of Thomas Johnson was impeached at trial by the use of no less than three prior inconsistent statements taken from his prior deposition. At the trial, Mr. Johnson denied having a stereo at all while living in Brittany Place Apartments. In his deposition he admitted having both a stereo and tape recorder. At the trial he denied that incense was burned in the apartment while in his deposition he refers to prior warnings or complaints about his burning of incense. On cross-examination Mr. Johnson adamantly denied that any dancing had taken place on the night of June 16, 1973, at his apartment. In his deposition he stated that he did not remember whether dancing had taken place, but that it probably had. These inconsistencies, among others, tend to cast doubt on his overall testimony. After carefully considering all of the evidence in this case, and after seeing and hearing the witnesses, the Court concludes that Mr. Johnson's testimony is entitled to little if any weight. Additionally, the credibility of Mrs. Johnson's testimony was also called into question through similar use of her deposition. At the trial, Mrs. Johnson stated that she had never spoken to Mr. Albritton. However, in her deposition she stated that she had had two telephone conversations with him. Regarding the incident that occurred on the night of June 16, 1973, Mrs. Johnson admitted in her deposition that she had cursed the policemen. At trial, however, she stated that she did not remember cursing the police. It was also brought out at trial that the Johnsons had been evicted from another apartment complex subsequent to an incident wherein Mrs. Johnson was charged with resisting arrest. The management of that apartment has now authorized a collection agency to attempt to recover unpaid rent owed by the Johnsons. By Mr. Johnson's own admission, that account is still in the process of being paid in monthly installments.

We find that the evidence clearly shows the existence of many factors totally independent of race which were taken into account by defendants in deciding not to rent an apartment to the Johnsons, and each of those factors alone would be justifiable grounds for eviction.

As an evidentiary matter, we feel that plaintiffs have failed to sustain the burden of proving that their treatment by the defendants was racially motivated. See 42 U.S.C.A. § 3610(e). No proof of any plan or pattern of discrimination was presented. The only evidence put on by the plaintiffs was their own testimony, none of which was able to point to specific facts which might have the effect of proving discriminatory intent on the part of defendants. In addition, much of plaintiffs' testimony was discredited by their own prior inconsistent statements, as discussed earlier. The only other witnesses testifying for plaintiffs was an agent of the Department of Housing and Urban Development who had had no contact with the case save for a review of the file. The agent who actually worked the case was no longer with HUD and was unavailable. In endeavouring to sustain their allegation that defendants had offered them a one year's written lease, plaintiffs testified that others had seen the lease, but for some reason or other they could not produce it. This was true of all documents which plaintiffs claimed to be supportive of

their cause. None were produced at trial. Those who allegedly had seen those documents were likewise never called to testify. The only proof of any lease was an allegation that it existed. This was strenuously denied by defendants. In sum, plaintiffs offered little or no credible evidence to prove their charges of discrimination. Cases of this nature generally require that plaintiffs produce specific facts which tend to prove that race was the motivating factor behind a decision not to rent or to sell. In *Seaton v. Sky Realty, Inc.*, 491 F.2d 634 (C.A.7—1974), for instance, defendants refused to sell real estate to black plaintiffs. Plaintiffs offered evidence which tended to show systematic violations of 42 U.S.C.A. § 1982, such as defendants' policy of noting the races of prospective buyers on their "prospect" sheets. Similarly, in *United States v. Reddoch*, 467 F.2d 897 (C.A.5—1972), two former resident managers of defendants' apartment complex testified that they had received instructions on a policy of discrimination followed by defendants. The resident manager testified as to his concern over a "white backlash" which he thought would result from the admission of blacks as tenants. In these cases the complaints were predicated on a system or policy of discrimination followed by defendants, evidenced by specific probative facts. Here, the only showing by plaintiffs consisted of proof that they are a racially mixed couple, that they were complained against, and that they were evicted. The civil rights statutes, as interpreted, make it clear that one who sells or leases real estate has a right to refuse approval on any honest basis unrelated to the race of the prospective tenants. *Boyd v. Lefrak Organization*, 509 F.2d 1110 (C.A.2—1975); *Madison v. Jeffers*, 494 F.2d 114 (C.A.4—1974); *Pughsley v. Lakeshore Drive Cooperative Building*, 463 F.2d 1055 (C.A.7—1972). Here there existed many factors unrelated to race, any one of which would have justified a refusal to rent to, or eviction of, the plaintiffs. Some of these were an apparent falsification of the rental application, the possible connection of Mrs. Johnson with certain activities of questionable legality, the foul odors emanating from the Johnsons' apartment, the continued loud music, the unpaid rent, and finally the incident of June 16. The plaintiffs' testimony is largely conclusory and does not rule out a single one of the above factors as a possible reason for defendants' actions. The following excerpt from *Bush v. Kaim*, 297 F.Supp. 151 (N.D.Ohio—1969), is applicable to this case.

"This case arises under Title 42 U.S.C.A. § 1982. The plaintiff, to sustain a cause of action under this section, must prove that he has been deprived of the 'same right * * * to * * * lease * * real * * * property' as is enjoyed by white citizens. He must show that he has been denied the opportunity to rent the property solely on the basis of his race. If there has been such a denial, then a cause of action under Section 1982 arises. * * *

"In sustaining his burden for proving that there has been a prohibited discrimination under the Act, the plaintiff must show * * * that there is no apparent reason for the refusal of the defendant to rent the property to the plaintiff other than the plaintiff's race. * * *

"Section 1982 does not prohibit an owner from considering factors other than race in determining whether to sell or rent his property to a negro, or to any other person for that matter. An owner can refuse to rent or sell to anyone, negro or white, for any reason he chooses so long as the motivating reason for this decision is not the individuals (sic) race or color. * * *

"The statute guarantees to negroes only the 'same right' as is enjoyed by white citizens. It does not purport to grant to negroes rights which exceed those of white or other citizens. It provides merely that an owner may not refuse to rent to a negro solely on the basis of his race. Thus, an owner may refuse to rent to a negro for any reason he would refuse to rent to a white man. * * *

"The Act does not prohibit an owner from considering any factors other than race which he feels are relevant in deter-

mining whether to rent to one individual or another. Such factors, which an owner might consider, include the credit standing of the applicant, his assets, his financial stability, his reputation in the community, his age, the size of his family, the ages of his children, his past experience as a lessee or tenant, the length of time he plans to occupy the premises, and whether he is or is not a transient.

"The owner may also consider more subjective factors in determining whether he will rent to one individual or another. Thus, he may consider the applicant's appearance, his demeanor, the owner's estimate of his trustworthiness or truthfulness or other subjective factors. * * *

"An owner may even refuse to rent to an individual simply because he does not like him. No one is required to rent or sell to an individual he doesn't like. As in other cases, however, the owner may later be called upon to demonstrate in court that his personal dislike of an individual, rather than the individual's race, was responsible for his decision to refuse him as a tenant. * * * Indeed, *any* factor, other than race, which is relevant to a decision whether to rent or sell to an individual may be considered, and the list of factors set forth above is not intended to be, and could not constitute, an exclusive list."

See also *Fred v. Kokinokos*, 347 F.Supp. 942 (E.D.N.Y.—1972).

Being of the opinion that plaintiffs have failed to prove their allegations of racial discrimination by a preponderance of the evidence, the Court finds in favor of the defendants and against the plaintiffs, and judgment will be entered accordingly.