Bennett ROBINSON, Plaintiff-Appellant,

v.

12 LOFTS REALTY, INC., and Paul Hanley, Defendants-Appellees.

No. 186, Docket 79–7437.

United States Court of Appeals, Second Circuit.

Argued Sept. 7, 1979.

Decided Nov. 21, 1979.

Richard F. Bellman, New York City, N. Y. (Eisner, Levy, Steel & Bellman, P.C., James I. Meyerson, National Association for the Advancement of Colored People, New York City, on the brief), for plaintiff-appellant.

Paul D. Wexler, New York City (Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, New York City, on the brief), for defendant-appellee 12 Lofts Realty, Inc.

Basil R. Pollitt, Brooklyn, N. Y., for defendant-appellee Paul Hanley.

Before KAUFMAN, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

This is an appeal by plaintiff Bennett Robinson from an order of the United States District Court for the Southern District of New York (Lee P. Gagliardi, Judge), denying an application for a preliminary and permanent injunction under the Fair Housing Act of 1968, 42 U.S.C. §§ 3601–3631 (1976), and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982 (1976), directing the defendant 12 Lofts Realty, Inc. (the "corporation") to permit him to purchase a cooperative apartment. For the reasons stated below we reverse and remand for further proceedings.

I

The defendant corporation owns a twelve-story cooperative apartment building in Manhattan (the "building"). In January 1979, the corporation had ten shareholders; each shareholder owned ten shares and had a proprietary lease of one floor of the building. Defendant Paul Hanley is one of the shareholders of the corporation. He holds a proprietary lease of the seventh floor of the building. All of the building's shareholders are White; there has never been a Black shareholder.

Plaintiff Bennett Robinson, who is Black, resides in a Manhattan rental apartment with his wife and two young daughters. Robinson holds a Ph.D. degree in physics from Stanford University and is employed as a research physicist by IBM. He earns a salary of $26,500 a year, plus $8,000 in benefits and stock options.

On January 22, 1979, Robinson entered into a written contract with Hanley to purchase, for $45,000, six and two-thirds of Hanley's shares and a proprietary lease of the south two-thirds of the seventh floor of the building. The contract made the sale conditional on Hanley's obtaining the consent of the corporation to the transfer.

On February 26, a meeting of the corporation's shareholders was convened to discuss the proposed sale to Robinson. At the meeting the building's manager reported that the second floor of the building was about to be sold to one Donald Kuspit, a White person. Thereafter, there was a "general discussion" of the proposed sale to Robinson. Following the discussion, the shareholders voted to amend the corporation's by-laws to establish a screening committee, which would meet with any prospective buyer and obtain a credit report, a resume, and a recommendation from his former landlord; the committee would then report to the shareholders at large for a final vote.

Following the February 26 meeting a screening committee was formed. The new procedure was not followed with respect to Kuspit, who soon became the corporation's eleventh shareholder.[1] The committee eventually met with Robinson and his wife in early May. At the committee interview there was apparently a tenor to some of the committee's questions and comments that Robinson found offensive. The committee asked Robinson whether he had ever been convicted of a crime, whether he was involved in any "after-hours" club, and whether he had underworld connections. One committee member elaborated that they did not want criminal elements in the building, and stated that there had been a rumor floating around the building linking Robinson with criminal elements and an after-hours club. Despite his resentment at the questioning, Robinson answered all questions and assured the committee that he had never been convicted of a crime, had no underworld connections and had no involvement in any after-hours club, and that the space that he sought to purchase from Hanley was to be used as a residence for Robinson and his family.[2]

---

1. There was no committee interview, and no formal vote of the shareholders or the board was ever taken with respect to Kuspit, who purchased his shares and was a shareholder by the time the corporation rejected Robinson's application.

2. Robinson testified that he had told Hanley he had been "thinking about investing in a place that was a night club. It happens to be in a loft . . . ." (Tr. 53–54.) He testified that he had never had any intention, nor told anyone he had any intention, of using the space to be

The screening committee's written report, dated May 11, 1979, stated, that Robinson's credit report, his resume, and a telephonic check with his landlord were all "satisfactory." The report also stated that the "Screening committees [*sic*] questions discussed that Dr. & Mrs. Robinson intended to use the space as their personal residence," and that at the interview the Robinsons had "answered all questions satisfactorily."

On May 17, a combined meeting of directors and shareholders was held to consider Robinson's proposed purchase. The first order of business, after correction and approval of the minutes of the previous meeting, was a review of the corporation's by-laws "to allow the agenda matter (7th fl. partial sale [to Robinson]) to take place with full understanding of the formal procedure required." (Minutes of May 17, 1979 meeting, at 1.) Following a "general discussion of the by-laws," the shareholders voted unanimously to increase the "51% majority needed for approval" of a proposed resale of stock to 66⅔%. (*Id.*)[3] They then voted 10–1 to allow a secret ballot on all resale and sublet decisions. (*Id.*) Then, after hearing a report of the screening committee, and receiving the committee's written report in which all matters were described as "satisfactory," the shareholders disapproved Robinson's purchase because only seven shareholders out of eleven (*i. e.*, fewer than ⅔) voted in favor of it. (*Id.* at 2.)

Robinson was thereafter notified of the rejection and brought this suit in the district court under 42 U.S.C. § 3601 *et seq.* and 42 U.S.C. §§ 1981 and 1982, seeking damages and injunctive relief. He moved for a preliminary injunction directing the corporation to permit him to consummate his purchase from Hanley and restraining the corporation from taking any action to interfere with that purchase.[4] An evidentiary hearing was held on the motion. All of the events described above were brought out during the plaintiff's presentation of his case.

Four of the corporation's shareholders, including Hanley, were called as witnesses for the defense. Richard Wengenroth, the corporation's president and a member of the screening committee, described the May 17 meeting at which Robinson's purchase was disapproved. He testified that he had reported to the shareholders that as to the objective questions considered by the screening committee, Robinson was "acceptable." He ascribed the rejection of Robinson to subjective reactions:

> At the same time, there were other questions that did not have to do with what I can only call objective matters, but had to do more with questions of personality exchanges that had been had between various people in the building with the applicant, and those were extended discussions.

(Tr. 110.) Another shareholder, Joseph Russo, testified that "hours of discussion" were devoted to the question of Robinson's purchase, and that

> Generally speaking, most of the people who had had any contact with him indicated to the rest of us that he had a personality that generally seemed counter to the personality that we were looking for. He was argumentative, he was caustic, he was sarcastic. In general, he did not get along with most of the people. It was as if he was demanding that space rather than asking, as everyone else had. That was the general tenor of almost

purchased from Hanley for any purpose other than his family's residence. (Tr. 27.)

**3.** The corporation's by-laws did not expressly provide what consent was necessary for a transfer of shares; instead, they incorporated by reference provisions of the proprietary leases, which, according to the testimony of the president of the corporation, required 51 per cent approval for a sale. The president also testified that although all of the initial sales of space had been handled informally, they had been made with the unanimous consent of the owners.

**4.** Suit was brought initially only against the corporation. Hanley was later added as a defendant to enable complete relief to be granted. Hanley has remained willing to perform his agreement to sell to Robinson.

all—in fact, of all of the comments, possibly with the exception of one that wasn't in that particular vein, but everyone that had met with him indicated that there was an acerbic quality to his personality that came out in every conversation with every member of the group thus far. (Tr. 80–81.) Russo also testified that it was reported at the May 17 meeting that Robinson had used profanity in a discussion with another shareholder.

Paul Waldman, the shareholder who owned the sixth floor, also supported the view that the shareholders found Robinson "disagreeable" and "did not like him personally":

> Oh, the reasons were virtually unanimous, that they felt he was an extremely abrasive person. He was a person who was caustic and abrasive and would not fit into the personality of this family.

(Tr. 97–98.) Waldman also indicated, as had Robinson in his testimony, that there had been sharp conflict between himself and Robinson with respect to Robinson's desire to install plumbing for the seventh floor by running a waste line through the floor and out along the ceiling of the sixth floor. However, Waldman testified that Robinson's desire to follow this procedure was not discussed at either the February 26 or the May 17 meeting.[5] Robinson testified that he was aware prior to the May 17 meeting that Waldman would not permit this procedure and that Robinson was leaning toward use of an alternative procedure that had been adopted by Wengenroth.

Following the hearing, the motion for a preliminary injunction was combined with the application for a permanent injunction and the hearing was ordered consolidated with a trial on the merits of the injunction claims[6] pursuant to Fed.R.Civ.P. 65(a)(2). The district court noted the defendant corporation's suggestion that it might wish to call additional witnesses but stated that in view of the court's disposition of the matter no further testimony would be required.

The district court denied injunctive relief. It found that although Robinson had made out a prima facie case of housing discrimination, thus shifting to the defendant corporation the burden "to show in a convincing manner that there is a substantial justification for denying the plaintiff access to" the building, the corporation had met its burden:

> In the instant action, plaintiff has established his prima facie case by showing (1) that he belongs to a racial minority, (2) that he sought and could afford to purchase the south [sic] floor, and (3) that his application was denied. This court nonetheless concludes that no Section 3604 violation has been established because the defendant has come forward with evidence, as it has been described above, of legitimate, non-racial motivations for its change in voting procedures at the May 17, 1979 meeting and its subsequent denial of plaintiff's application to purchase shares in the defendant corporation.

The defense evidence credited by the district judge with respect to the corporation's change in voting procedures was testimony that the change was made because this was the first resale of stock in the building, as contrasted with an original sale.

The evidence adverted to by the court as to the reasons for the denial of Robinson's application fell into two categories: rumors and animosity. First the court found that "rumors with regard to the plaintiff had come to the attention of the various members of the defendant corporation" (Joint Appendix (hereinafter "A.") at 15–16) that Robinson intended to use the premises for an after-hours club, that he intended to put plumbing lines through Waldman's ceiling, and that he had uttered vulgar language to another shareholder. The court expressly declined to assess the truth of these rumors,

---

5. Although Waldman stated that he had told Robinson he "could not conceive of someone going through someone else's apartment living areas with waste lines" (Tr. 86), he admitted that in fact some shareholders have done just that (Tr. 95–96).

6. Robinson reserved his right to a jury trial on his claim for damages.

noting that Robinson denied them. Second, the court found that

> the steering committee, while it was indicated that the data supplied to it in response to the plaintiff being [*sic*] sufficient, nonetheless they had reported that in their opinion [plaintiff] had been abrasive in the interview that they had conducted for him, that he had resented certain questions that were asked of him, and others had indicated that in their opinion, the plaintiff had displayed an arrogant and uncooperative approach to the procedures that they had requested that he comply with before passing upon his application.

(A.18–19.)[7] Based on these findings, the court concluded "that defendant cooperative denied plaintiff's application for reasons other than his race." (A.20.)

The corporation denied Robinson's application because four shareholders voted against it. There was no evidence in the record, however, to show which shareholders cast the negative votes. Thus although the court found the above rumors to be "current" among the shareholders and credited the testimony that Robinson had appeared abrasive, it did not, and could not, make any finding of the actual motivation for the disapproval of Robinson's purchase.

Following the district court's denial of injunctive relief, Robinson took this appeal.[8]

## II

The Fair Housing Act, enacted as Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631 (1976), makes it unlawful, with certain exceptions not perti-

nent here, for any person to refuse to sell or otherwise make unavailable a dwelling to any person because of race.[9] Section 3604(a) of 42 U.S.C. provides in pertinent part as follows:

> [I]t shall be unlawful—
>
> (a) *To refuse to sell* or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny, a dwelling to any person because of race, color,* religion, sex, or national origin. (Emphasis added.)

Section 3602(b) defines "dwelling" to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families," and clearly applies to cooperative apartment buildings such as that involved in the present action. Section 3612 gives a private right of action to a person who claims to have been denied housing on a basis prohibited by § 3604.

The threshold question in an action to enforce § 3604 is what the plaintiff must show in order to make out a prima facie case. The courts that have dealt with this question have concluded that in order to prove a prima facie case of race discrimination plaintiffs needed to show only that the action complained of had a racially discriminatory effect; they were not required to show that the defendants acted with racially discriminatory motivation. *E. g., Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1287–90 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772

---

7. Despite the characterization of Robinson's "approach" as "uncooperative," the court found that Robinson had provided all of the information requested of him: "All of the materials were supplied to the defendant and it was conceded at the hearing that the plaintiff and the information submitted by him was acceptable to the defendant corporation." (A.13.)

8. The district court denied a motion for a stay pending appeal. On August 6, 1979 this Court expedited the appeal and granted an injunction preserving the status quo pending the outcome of this appeal, on the condition that Robinson post a $15,000 bond in Hanley's favor and in

addition pay Hanley $500 per month, the amount Hanley is said to be out-of-pocket for maintenance payments, while this injunction is in effect.

9. Robinson also sought injunctive relief under 42 U.S.C. § 1982, which provides that "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Since the record does not disclose whether or not Robinson is a United States citizen, we address only his Title VIII claim.

(1978) (hereinafter *"Village of Arlington Heights II"*); *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 146–48 (3d Cir. 1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 233 (8th Cir. 1976); *United States v. City of Black Jack,* 508 F.2d 1179, 1184–85 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *United States v. Youritan Construction Co.,* 370 F.Supp. 643, 648 (N.D.Cal.1973), *aff'd in part,* 509 F.2d 623 (9th Cir. 1975). Thus, in *United States v. City of Black Jack, supra,* the Eighth Circuit stated as follows:

> To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. . . The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated. . . . Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations . . ..

508 F.2d at 1184–85 (citations and footnotes omitted).

The history of the *Village of Arlington Heights II* litigation supports this view. In that action, the plaintiffs sought to compel the Village to rezone their property in order to permit the construction of federally financed low-cost housing. When defendants refused to rezone, plaintiffs brought suit claiming violations of the Fair Housing Act and the Equal Protection Clause of the Fourteenth Amendment. Observing that the plaintiffs had proven a discriminatory effect, but not a discriminatory intent, the Seventh Circuit initially upheld the constitutional claim but did not reach the Fair Housing Act claim. *Metropolitan Housing Development Corp. v. Village of Arlington*

*Heights,* 517 F.2d 409 (7th Cir. 1975), *rev'd,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Supreme Court reversed, holding that, in order to establish a violation of the Equal Protection Clause, a showing of discriminatory impact is not sufficient; discriminatory motive must also be shown. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 268–71, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Since no discriminatory motivation had been shown, the initial decision of the Seventh Circuit was reversed. However, the Supreme Court noted that the plaintiffs had also alleged a violation of the Fair Housing Act, and as to that claim the Court remanded the case for further consideration.

With this history in mind on remand, the Seventh Circuit reasoned that a prima facie case under the Act could be established on the basis of effect alone. In reaching this conclusion, the court took account of the similarity of Title VIII, which bans housing discrimination, to Title VII which bans discrimination in employment, and relied in part on the thrust of the Supreme Court's decisions in employment discrimination cases. It noted that while in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court had held that discriminatory motivation was required to establish a violation of the Equal Protection Clause, in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), which was reaffirmed in *Washington v. Davis,* the Supreme Court had held that a showing of discriminatory intent was not necessary to establish a prima facie case under Title VII. *Village of Arlington Heights II, supra,* 558 F.2d at 1288–90. Thus the Seventh Circuit, along with most other circuits, has held that discriminatory impact is the appropriate standard by which to determine whether a plaintiff has made out a prima facie case under § 3604(a).[10]

---

**10.** The decision of this Circuit in *Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir.), *rehearing denied,* 517 F.2d 918 (2d Cir.), *cert. denied,* 423 U.S. 896, 96 S.Ct. 197, 46 L.Ed.2d 129 (1975), is not inconsistent. In *Boyd,* the majority rejected a challenge to a landlord's facially neutral requirements that may have had a racially discriminatory impact, stating as follows: "we will not impose an affirmative duty on the private landlord to accept low income tenants

While most of the cases have pondered the nature of the prima facie case in the context of actions that affect a large group of people, the question has also been considered, and the effects test adopted, in suits brought to redress discrimination against individual plaintiffs. For example, in *Smith v. Anchor Bldg. Corp., supra*, 536 F.2d at 233, the Eighth Circuit stated as follows:

> The concept of the prima facie case applies to an individual housing discrimination case. *United States v. City of Black Jack, id.*, 508 F.2d at 1184; *Williams v. Matthews Co., supra*, 499 F.2d at 826; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). Therefore, where a black rental applicant meets the objective requirements of a landlord, and the rental would likely have been consummated were he or she a white applicant, a prima facie inference of discrimination arises as a matter of law.

■ By analogy to the employment discrimination area, a plaintiff who claims that he as an individual has been the victim of a discriminatory denial of housing, may establish his prima facie case by proving the following facts:

(1) that he is Black;

(2) that he applied for and was qualified to rent or purchase the housing;

(3) that he was rejected; and

(4) that the housing opportunity remained available.

*Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Consistent with the above authorities, the district court in the present case adopted the effects test as the proper standard. Finding that Robinson had established that he was a member of a minority, that he could afford to purchase the space sought, and that his application had been denied, the court held that Robinson had made out a prima facie case.

Even if a motivation test were applied Robinson would be found to have established his prima facie case, for the nature and timing of the corporation's actions with respect to Robinson's application readily permits an inference of racially discriminatory motivation. As Mr. Justice Stevens observed in his concurring opinion in *Washington v. Davis, supra*, "[f]requently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." 426 U.S. at 253, 96 S.Ct. at 2054. Similarly, the Supreme Court's opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, points out:

> The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . . For example, if the property involved here always had been zoned R–5 but suddenly was changed to R–3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.

429 U.S. at 267, 97 S.Ct. at 564 (footnote omitted).[11]

---

absent evidence that his motivation is racial rather than economic in origin." 509 F.2d at 1113. In dissent, Judge Mansfield stated:

> With due respect, the majority opinion seems to me to be grounded upon the erroneous concept that, in order to establish a violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq., direct evidence of a racially discriminatory motive or purpose on the part of the alleged violator must be adduced. In my view such proof is not required.

*Id.* at 1115. However, these conclusions were drawn after a full trial of the case, in which the defendant had come forward with evidence as to why the criterion it adopted was used and why it was relevant to its decisions whether to rent the premises. The conclusion after a full trial that the plaintiffs have failed to show racial motivation does not imply that proof of motivation was required in order for the plaintiffs to establish a prima facie case.

11. *See also United States v. City of Black Jack, supra*, 508 F.2d at 1182–83; *Wharton v. Knefel*, 562 F.2d 550, 555 (8th Cir. 1977); *Wang v. Lake Maxinhall Estates, Inc.*, 531 F.2d 832 (7th Cir. 1976); *United States v. Grooms*, 348

The evidence presented by Robinson as to the sequence of actions taken by the defendant corporation goes beyond establishing merely a discriminatory effect. When Robinson's proposed purchase came before the shareholders, the previous informal procedure was changed and a screening committee was created. Although it was said that the new procedure was to be followed with respect to "any" prospective purchaser, it was not followed with respect to Kuspit, the White prospective buyer who was then about to purchase the second floor; there is no indication that at that time there were any prospective purchasers other than Kuspit and Robinson. Following the determination by the newly established screening committee that Robinson's finances, recommendation, and all other "objective matters" were satisfactory, the corporation increased the percentage needed for approval of Robinson's purchase from 51% to 66⅔%, and allowed the negative votes of four shareholders out of eleven to defeat the application. This sequence of events brings a conclusion of discriminatory motive well within the realm of legitimate inference.[12] It is clear, therefore, that even were a motivation test to be applied, plaintiff has established a prima facie case.

### III

The action under Title VIII does not normally end with the plaintiff's establishment of a prima facie case of race discrimination. The burden shifts to the defendant to come forward with evidence to show that his actions were not motivated by considerations of race. If the defendant does not present such evidence, the plaintiff will be entitled to relief. E. g., Resident Advisory Board v. Rizzo, supra, 564 F.2d at 146; Smith v. Anchor Bldg. Corp., supra, 536 F.2d at 233:

[W]here a black rental applicant meets the objective requirements of a landlord, and the rental would likely have been consummated were he or she a white applicant, a prima face inference of discrimination arises as a matter of law. If the inference is not satisfactorily explained away, discrimination is established. Williams v. Matthews Co., supra, 499 F.2d at 826.

In order to meet its burden the defendant must offer evidence of the reasons its action was taken. Given the nature of the reasons proffered below, we do not believe this burden was satisfied in the present case. The corporation conceded that Robinson met all of the corporation's financial and objective criteria, and relied merely on possible subjective factors that could have induced votes against Robinson's purchase by four unidentified shareholders. Thus, although there was testimony that there were "rumors," there was no evidence that anyone believed the rumors to be true. There was no evidence as to which shareholders voted against Robinson, nor, perforce, any evidence as to their actual reasons. Without identification of and testimony by the persons who actually caused the denial of Robinson's application, it cannot be determined what motivated the rejection.

Our view that in the present case the corporation cannot successfully rebut plaintiff's prima facie case without the testimony of all of the stockholders who voted "no" does not suggest that such a requirement would be imposed in all cases. It is appropriate here because Robinson fell short of the required approval by just one vote. Thus, if any one of the four stockholders

F.Supp. 1130 (M.D.Fla.1972); Williamson v. Hampton Management Co., 339 F.Supp. 1146 (N.D.Ill.1972).

12. The corporation's president testified that over the years some 15–16 Blacks, no more than one or two at a time, had been subtenants or guests in the building. It is not clear whether this estimate was for the period since August 1977 when the witness first moved into the building, or dated back to 1975 when the building first was converted to residential use. In any event, while this evidence has some relevance to whether or not the corporation's motivations were racial, the corporation's willingness to have Blacks in the building on short-term bases does not dispose of the contention that the corporation was motivated by racial considerations in acting to prevent a sale.

voted against Robinson because of his race, he was denied housing because of his race, regardless of the motives of the other three negative voters: the reversal of that one racially-motivated vote would have resulted in the approval of Robinson's purchase.

■ In the absence of testimony from the four negative voters, therefore, we find that the district court's conclusion that the corporation rejected Robinson's application "for reasons other than his race" is unsupported by the evidence. A prima facie case having been established, a Fair Housing Act claim cannot be defeated by a defendant which relies on merely hypothetical reasons for the plaintiff's rejection. To permit such a defense to prevail would effectively nullify the Act.

Because the trial was conducted initially as a hearing on the motion for a preliminary injunction and because the corporation may have been forestalled from coming forward with adequate justification for the denial of Robinson's application, we remand the case to the district court for further proceedings. If the shareholders who prevented Robinson's purchase do not come forward to testify in these proceedings, Robinson will be entitled to injunctive relief.

### IV

On remand, assuming that the four shareholders who voted against Robinson come forward to testify, the district court will be called upon to evaluate the sincerity of their stated reasons for voting against Robinson's purchase, and to determine whether the concerns they had negative any discriminatory intent that may be inferred from the sequence of events. To rebut Robinson's prima facie case, both issues must be decided in favor of the corporation.[13]

### A

In evaluating the proposed justifications, the district court must carefully scrutinize suggested reasons that are not objective in nature. In cases in which discriminatory intent could be inferred from the sequence of events, the courts have generally viewed subjective explanations with considerable skepticism. The wisdom in such skepticism is obvious. "*Any* defendant can respond to a discriminatory effect with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." Comment, *Applying the Title VII Prima Facie Case to Title VIII Litigation,* 11 Harv.C.R.–C.L.L.Rev. 128, 182 (1976) (emphasis in original). Thus, the courts have rejected defenses that a Black was denied housing because he would not "fit in" with the other tenants, *United States v. Youritan Construction Co., supra,* 370 F.Supp. at 650 ("Prospective compatibility with other tenants is not an appropriate rental consideration where its application would have a discriminatory racial impact"); or because the applicant failed to comply with special procedures to show that he would be "a 'congenial' tenant," *United States v. Grooms,* 348 F.Supp. 1130, 1133 (M.D.Fla.1972); or because he was a "belligerent appearing" applicant, *United States v. West Peachtree Tenth Corp.,* 437 F.2d 221, 223–24 (5th Cir. 1971) ("While such a [screening] procedure appears necessary and practical on the part of management in order to keep undesirables of any race out of the building, it does create the 'opportunity' for discrimination in rentals"); or because the applicant was seen as "irritable and belligerent, more belligerent, and

---

13. If the district court concludes that the defendant corporation has rebutted Robinson's prima facie case, the hearing should not necessarily be ended there. *Cf. McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804, 93 S.Ct. 1817, 1825. Robinson must thereafter "be afforded a fair opportunity to show that [defendant's] stated reason for [Robinson's] rejection was in fact pretext." *Id.* Of especial relevance would be evidence that the reasons advanced

by the defendant for the rejection had not been considered sufficient by the defendant to reject White applicants. *Id.* We have already adverted, for example, to the fact that some shareholders have run plumbing lines through the ceiling of the floor below. Robinson should be given the opportunity to demonstrate as fully as he can any pretextual character to the corporation's rebuttal.

most belligerent," and was classified with potential "troublemakers," *Newbern v. Lake Lorelei, Inc.,* 308 F.Supp. 407; 413, 414 (S.D.Ohio 1968) (§ 1982 action); or because the applicant was classified as a "trouble-maker" on the strength of the defendant's belief that the applicant might bring a court challenge to certain subdivision building restrictions, *Williams v. Matthews Co.,* 499 F.2d 819, 828 n. 11 (8th Cir.), *cert. denied,* 419 U.S. 1021, 1027, 95 S.Ct. 495, 507, 42 L.Ed.2d 294, 302 (1974); or because the applicant may have had unclean clothing producing an offensive or stale odor, *Stevens v. Dobs, Inc.,* 483 F.2d 82, 83 (4th Cir. 1973).

On remand, the court here should be similarly probing. The decision whether to credit the reasons advanced requires consideration of two questions: whether the factors cited were actually believed by those who voted "no"; and if so, whether it was their belief in those factors that impelled them to vote "no." In making the latter determination, the logical relevance of the factor to the rejection is of significance. If the factor (whether subjective or objective) lacks relevance to the applicant's fitness in the housing context, it becomes suspect. *See, e. g., Bishop v. Pecsok,* 431 F.Supp. 34, 37 (N.D.Ohio 1976) ("Objective criteria cannot have the effect of excluding blacks from housing unless the criteria are demonstrably a reasonable measure of the applicant's ability to be a 'successful tenant.'") *Cf. Griggs v. Duke Power Co., supra,* 401 U.S. at 436, 91 S.Ct. 849. Thus the court should consider whether it is credible that negative votes were cast because of a rumor that Robinson wanted to use the premises as an after-hours club, in light of his persistent denial of that rumor. Certainly the screening committee's report seemed to indicate a belief that Robinson wanted the premises for his residence. And the objective of preventing an after-hours club on the premises could have been achieved

without discriminatory impact, simply by having all shareholders, old and new, covenant not to use the premises for that purpose. *See, e. g., Resident Advisory Board v. Rizzo, supra,* 564 F.2d at 149. Similarly, the court should consider whether it is credible that negative votes were cast because of a rumor that Robinson wanted to run plumbing lines through Waldman's ceiling. Assuming that the shareholders believed this rumor, the question remains whether their belief led them to vote against Robinson in light of the facts that such a desire on Robinson's part was not discussed at either of the shareholders meetings, and that some of the shareholders had in fact already used this type of procedure to meet their plumbing needs. Finally, in assessing any explanation that depends on a rumor, the court must bear in mind that rumors are easily started and, although perhaps facially neutral, may easily be advanced with discriminatory intent.

The "animosity" defense also must be analyzed carefully, especially where it is predicated upon plaintiff's so-called "argumentative" or "caustic" reactions, which may well have been provoked intentionally by insistent and unprecedented questioning as to his possible underworld connections and the like.[14] *See, e. g., Newbern v. Lake Lorelei, Inc., supra,* 308 F.Supp. at 414, in which the defendant corporation attributed its rejection of a Black prospective buyer to his belligerency; the court rejected this defense, finding that the plaintiff had simply reacted to defendants' discourteous and stalling tactics, and that these tactics were "designed to cause what it described as a 'belligerency.'" In addition, in assessing testimony that the shareholders found Robinson too abrasive to "fit into" the "family," the court should consider the fact that seven out of eleven shareholders nevertheless voted to approve the purchase, and the fact that no shareholder, save Hanley, would even be on the same floor as Robin-

---

14. Apparently it was only Robinson who underwent questioning of this tenor. The testimony below was that Kuspit, for example, was asked merely where he worked and whether he could afford the purchase.

son.[15] We note that Hanley, who had earlier rejected an offer from Robinson to buy the entire seventh floor for $70,000, chose to keep one-third of the floor and has remained willing to share that floor with Robinson.

## B

If, after weighing all of the evidence, the court credits the reasons advanced as genuine, it must bear in mind that, despite occasional dicta to the contrary, race need not be the sole motivating factor in a denial that has a discriminatory effect in order for the plaintiff to succeed in a Title VIII claim. The denial violates § 3604(a) if race is even one of the motivating factors. *E. g., Williams v. Matthews Co., supra,* 499 F.2d at 826; *United States v. Pelzer Realty Co.,* 484 F.2d 438, 443 (5th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 349–50 (7th Cir. 1970); *Wang v. Lake Maxinhall Estates, Inc.,* 531 F.2d 832, 836 n. 12 (7th Cir. 1976); *Bishop v. Pecsok, supra,* 431 F.Supp. at 37. *Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 265–66, 97 S.Ct. 555.

In *United States v. Pelzer Realty Co., supra,* a district court denied injunctive relief in a Fair Housing case on the ground that a defendant had non-racial as well as racial motivations for his refusal to sell to Blacks on the same terms as Whites. The Court of Appeals for the Fifth Circuit reversed, stating that while it did not doubt that the defendant's "primary goal was to make money," 484 F.2d at 443, "[w]e need not and do not find that racial prejudice dominated [defendant's] mind during the negotiations. It is enough that race was one significant factor he considered in his dealings with the men." *Id.* Similarly, in *Smith v. Sol D. Adler Realty Co., supra,* the Seventh Circuit upheld a finding by the district court that race was but one factor involved,[16] but reversed the denial of relief, stating as follows:

> [R]ace is an impermissible factor in an apartment rental decision and . . . it cannot be brushed aside because it was neither the *sole* reason for discrimination nor the total factor of discrimination. We find no acceptable place in the law for partial racial discrimination.

436 F.2d at 349–50 (emphasis in original).

While a few courts have stated *obiter* that in order to prove a Fair Housing Act claim a plaintiff must show that he was denied housing *solely* on the basis of his race, *e. g., Duckett v. Silberman,* 568 F.2d 1020, 1023 (2d Cir. 1978), we know of no case in which a Fair Housing Act claim was rejected on this ground where it was established that race was a partial reason for the denial of housing. Thus, although in *Duckett* this Court upheld the dismissal of a Fair Housing Act claim, citing *Bush v. Kaim,* 297 F.Supp. 151, 162 (N.D.Ohio 1969), and noting the district court's conclusion that the "plaintiffs failed to establish that there was no apparent reason for the refusal of defendant to sell to plaintiffs other than the latter's race," the Court found that race was not a factor at all: "there was no evidence that race actually was considered a factor by the seller." 568 F.2d at 1024.

Nor does *Bush v. Kaim, supra,* a case brought under 42 U.S.C. § 1982, hold that a claim of housing discrimination may not be sustained unless race is the only motivation. Although that court recited as an element to be proven "that there is no apparent reason for the refusal of the defendant to rent the property to the plaintiff other than

---

**15.** The fact that certain areas of the building or grounds would be common areas does not, of course, justify exclusion on the basis of race. *United States v. Grooms, supra,* 348 F.Supp. at 1132–33; *cf. Newbern v. Lake Lorelei, Inc., supra,* 308 F.Supp. at 416.

**16.** " '17. *The [district] court is of the opinion that the evidence shows defendants were only too happy to find a valid excuse for denying the rental of said apartment to Gloria Smith . . . .' "* 436 F.2d at 349 (emphasis added by Court of Appeals).

the plaintiff's race," 297 F.Supp. at 162, the court proceeded to find that race was in fact the sole reason, and granted the plaintiff relief. *Id.* at 163. Indeed, Judge Lambros, who decided *Bush v. Kaim,* has expressly noted the holdings of cases such as *Smith v. Sol D. Adler Realty Co., supra,* "that *the motivating reason* upon which a refusal to rent or sell property is premised cannot be, in whole or in any part, racially oriented," *Drain v. Friedman,* 422 F.Supp. 366, 370 (N.D.Ohio 1976) (emphasis in original), and has stated that *Bush v. Kaim* is consistent with this view. *Id. Accord, Bishop v. Pecsok, supra,* 431 F.Supp. at 37 ("Race cannot be the sole reason for rejecting a prospective tenant; [citing *Bush v. Kaim* ], nor can it be *any part* of the reason that a prospective tenant is denied housing") (emphasis in original).

In sum, therefore, in order for the corporation to prevail, the district court must find that racial motivation did not play any role in the decision to deny Robinson's application. In its deliberations, the court must remember that "clever men may easily conceal their motivations." *United States v. City of Black Jack, supra,* 508 F.2d at 1185. "As overtly bigoted behavior has become more unfashionable, evidence of intent has become harder to find. But this does not mean that racial discrimination has disappeared." *Village of Arlington Heights II, supra,* 558 F.2d at 1290. It means that when a discriminatory effect is present, the courts must be alert to recognize means that are subtle and explanations that are synthetic.

In the final analysis, the court should bear in mind that throughout, Hanley has been willing to sell ⅔ of his floor to Robinson, only to be thwarted by the corporation. We should be especially chary of permitting a third party to prevent, on the basis of easily fabricated subjective factors, a sale of housing by a willing seller to an objectively acceptable buyer.

We reverse and remand for further proceedings consistent with this opinion.[17] We trust that Judge Gagliardi's calendar will permit an expedited rehearing.

---

**17.** We leave to the district court the fashioning of further interim injunctive relief (see note 8 *supra* ) if such is required.