**Victor GRIFFIN, Plaintiff,**

v.

**GEORGE B. BUCK CONSULTING ACTUARIES, INC., Defendant.**

**No. 81 Civ. 4164(MEL).**

United States District Court, S.D. New York.

Dec. 9, 1982.

James I. Meyerson, New York City, for plaintiff.

Kelley, Drye & Warren, New York City, for defendant; Martin D. Heyert, Alan C. Becker, New York City, of counsel.

LASKER, District Judge.

On December 28, 1977, Victor Griffin wrote to George B. Buck Consulting Actuaries, Inc. ("Buck") to request an employment interview. Griffin, who is black, is a 1975 *magna cum laude* graduate of the University of Pennsylvania, Wharton School of Business, where he obtained a Bachelor of Science degree in Economics

with a major in actuarial science and accounting. In the course of his studies at the University of Pennsylvania Griffin maintained a 4.0 average in his seven accounting courses and five actuarial science courses, and was awarded numerous academic prizes and citations. At the time of his application to Buck, Griffin had passed seven of the examinations administered by the American Society of Actuaries, and was therefore an Associate Member of the Society.[1]

Upon receipt of Mr. Griffin's letter, Buck invited Griffin to come for an interview on January 24, 1978 at Buck's offices in New York. On that date Griffin was interviewed for a position as an actuarial trainee by Patricia Sic, then a recruiter for Buck, and by Paul Westbrook, then the Director of Personnel. Following these interviews, Griffin received a letter of rejection. A complaint to the New York State Division of Human Rights,[2] and later this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, followed.

### I.

#### A. *Griffin's Testimony*

At trial, Griffin and Westbrook were the only two witnesses to testify. Griffin testified[3] first about his background and qualifications, which were summarized on the resume he sent to Buck (Pl. Ex. 2). He stated that he had applied to Buck on the recommendation of one of his professors at Wharton, who described Buck as one of the most prestigious pension consulting firms in the country. Griffin believed that the training he could receive at Buck would be invaluable.

Griffin's interview with Sic lasted ten to fifteen minutes. Sic did not question Griffin about his background, nor did she ask any questions designed to explore his actuarial knowledge. She did ask him, among other things, what salary he was looking for. Griffin answered that he was looking for $28,000, to which Sic replied that "he would be lucky if he got half of that." There was no further discussion of salary. During the interview Griffin asked Sic whether there were other black actuaries at Buck and whether Buck had an affirmative action program. Sic said that Buck had an affirmative action program but that they had trouble finding blacks who had passed even one or two examinations. Griffin pointed out that he had passed seven.

At the end of the interview, Sic took Griffin to Westbrook's office. The interview with Westbrook lasted 20 to 30 min-

---

1. By passing five examinations and paying the required dues, an individual becomes an Associate of the Society; by passing ten examinations an individual becomes a Fellow of the Society. There are 6,000 members of the Society (all either Associates or Fellows), of whom approximately 19 are black. Pl. Ex. 6.

2. The New York Division of Human Rights ("DHR") in a decision dated April 14, 1980, dismissed Griffin's complaint on a finding of no probable cause. Griffin's appeal to the New York Human Rights Appeal Board was dismissed for failure to file a timely notice of appeal. (Appeal No. 6640, July 9, 1980). The Appellate Division of the New York Supreme Court, First Division, refused to set aside the Appeal Board's dismissal in an order dated October 30, 1980. Buck argues that under the Supreme Court's ruling in *Kremer v. Chemical Construction Corporation*, —— U.S. ——, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), Griffin's Title VII claim in this court is barred by *res judicata*. We disagree. In *Kremer,* the Appellate Division had affirmed the DHR's determination on the merits, and the Supreme Court held that

the state court's action must be given *res judicata* effect in a Title VII action based on the same underlying events. In the instant case, there has been no state court judicial review on the merits of the state agency's determination, and *Kremer* is thus not controlling. Moreover, giving the DHR's decision preclusive effect in this action would work a serious injustice in the circumstances of this case. The finding of no probable cause was based entirely on the agency's one-sentence finding that "complainant was offered a position, after being interviewed, but declined to accept same for reasons of salary." It is difficult to understand how the DHR could have reached such a decision, if that body had before it the record before us.

3. This description of Griffin's testimony includes the testimony from his rebuttal case. References to the testimony are based upon the Court's notes, as no transcript has been prepared to date.

utes. Westbrook and Griffin did discuss some substantive matters relating to actuarial science, including the then new ERISA [4] legislation and recent changes in certain aspects of the social security system. Griffin asked Westbrook, among other things, what the requirements were for becoming a partner at Buck. Westbrook replied in substance that partnership was reserved for only a select group of people. There was no discussion between Griffin and Westbrook about salary or about Griffin's attitude toward the actuarial trainee program at Buck. Westbrook commented "out of the blue" at one point that he had a friend who graduated Phi Beta Kappa and nevertheless accomplished little in his career. Westbrook added that he was the only one from his neighborhood to go to college and that he believed one's environment had nothing to do with success.

Griffin testified that when he called Westbrook on February 13, 1978 to ask why he had been rejected, Westbrook said that Griffin had not warmed up to him during the interview, that other applicants would be better at working with the other actuaries at Buck, and that Griffin did not have the kind of personality that would enable him to get a job with a consulting firm. Realizing that Sic had indicated that the salary he mentioned was high, Griffin asked Westbrook whether the salary issue had been a problem. Westbrook replied that it had not; he told Griffin that he had not taken his thinking process that far. Griffin asked whether he had measured up to other candidates in terms of his knowledge of actuarial science, and Westbrook stated that his knowledge seemed to be good. Westbrook said that he thought Griffin was not really interested in the "nitty-gritty" aspects of the actuarial trainee position, to which Griffin answered that he did not understand that judgment since Westbrook never discussed the question with him. When Griffin stated that he believed he was being rejected because of his race and that he planned to take legal action against Buck, Westbrook replied that Griffin had the right to do so but that the effort would be futile.

## B. Westbrook's Testimony

Westbrook testified that, because of various awards and activities listed on Griffin's resume, he was aware that Griffin was black when he invited Griffin for an interview. Indeed, Westbrook stated that he authorized Sic to offer to pay Griffin's expenses in coming to New York, something that was not done for white out-of-town applicants, because Buck was interested in hiring members of minority groups.

Westbrook testified that he decided not to offer Griffin a position because Griffin's salary expectations were too high and he did not appear interested in the type of work an actuarial trainee must perform at Buck. During his interview with Westbrook, Griffin said that he was looking for a salary in the mid-20's, and that other firms were offering that much; the maximum salary Griffin could be offered at Buck, however, was $14,000. Buck's salaries, Westbrook explained, were "the lowest in the industry." He described the actuarial trainee position, moreover, as involving much tedious and mundane work. The duties of a trainee initially include proofreading letters written for clients by more senior personnel, to assure that mathematical computations are correct and that the letters are free of grammatical errors; reviewing and correcting any data submitted by a client; working with various computer data evaluation systems; and tasks such as copying documents and monitoring the final typing of client letters. Later in the training phase a trainee writes memoranda and drafts paragraphs to be used in client letters. Employees work in the actuarial training position for a period of one to four years,[5] after which they can advance to the

---

4. The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

5. Westbrook gave varying accounts of the amount of time an employee must spend in the actuarial trainee position. On direct examination, he stated that the training period was

position of "first assistant actuary" and from there to the higher levels of responsibility available at Buck. Westbrook stated that Griffin expressed little interest in the mundane aspects of the job; he told Westbrook that he thought he would complete the training period in a minimum amount of time, a statement that Westbrook considered "unrealistic." In Westbrook's view, Griffin placed too much emphasis on the actuarial examinations he had passed; Buck was more interested in practical work experience than in examinations.

Westbrook recalled Griffin's inquiry about the requirements for becoming a partner at Buck. He agreed that he had told Griffin that attaining the position of "consulting actuary," the highest position available at Buck, was difficult, but denied using words such as "reserved for a select few." Westbrook explained his reference to the friend who was a "Phi Beta Kappa" by saying that he had used it to illustrate to Griffin that academic excellence alone did not guarantee success.

Westbrook testified that after the interview, which he recalled as lasting about an hour, he discovered that Sic agreed with him that Griffin should not be hired. Sic prepared a letter of rejection, and discussed the matter with Westbrook again on February 3, 1978, just before the letter was sent. During that discussion, Sic mentioned that Griffin had raised the fact of his being black several times during her interview of him. Westbrook told Sic that they should prepare notes on the interviews in case there was a problem. He testified that he and Sic did not normally prepare notes of interviews unless there was a special reason to do so.

When Griffin called to ask why he had been rejected, Westbrook told him that he had not warmed up during the interview, that his salary expectations were too high,

and that he did not seem interested in the actuarial trainee position. Westbrook stated that Griffin responded by reiterating that other firms were offering salaries in the mid-20's, and that he would expect to complete the training period quickly. When Griffin said that he was thinking of pursuing legal remedies against Buck, Westbrook replied that that was his right.

## II.

In determining whether the plaintiff has proven a case of disparate treatment under Title VII, the first question to be addressed is whether the plaintiff has made a prima facie showing of intentional discrimination. In a racial discrimination case, a prima facie case is established by showing that the plaintiff belongs to a racial minority, that he applied and was qualified for a job for which the employer was seeking applicants, that he was rejected, and that after his rejection the employer continued to seek persons of the plaintiff's qualifications for the job. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The question whether Griffin has established a prima facie case of discrimination requires no extended discussion. That Griffin had the skills and qualifications necessary for a job with Buck is clear. Indeed, Buck's sole argument that Griffin has not established a prima facie case is that, because the firm had a continuing need for actuarial trainees, there was no *one* position into which a specific white person was hired instead of Griffin. This theory is without merit. Westbrook's own testimony showed that after Griffin's rejection Buck continued to seek and hire actuarial trainees who had passed fewer examinations than Griffin and who, like Griffin, had no work experience in the actuarial field. The vast majority of those hired were white.[6] Under these

three to four years. On cross examination, he said the period was two to three years. He later said that people were sometimes promoted after one to one and half years. The answers to plaintiff's interrogatories which West-

brook signed gave the period as one to three years.

6. Indeed, a white person who had passed no examinations, and who Buck did not even attempt to argue was more qualified than Griffin,

circumstances, it is unnecessary for Griffin to identify one particular position, of the many that were filled, as the position that was denied him. In sum, the evidence is more than sufficient to give rise to a presumption of intentional discrimination.

Accordingly, it must be determined whether Buck has rebutted the presumption raised by Griffin's prima facie showing by "articulat[ing] some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). This question too can be readily answered. Buck's evidence presents two nondiscriminatory reasons why Griffin may have been rejected: first, that his salary expectations were too high; and second, that he was not prepared to accept the mundane work initially required of an actuarial trainee. If these perceptions actually motivated the decision not to hire Griffin, Buck's action had a nondiscriminatory basis. Thus, Buck has produced sufficient evidence to rebut the presumption raised by Griffin's prima facie showing.

The focus of the factual dispute in this case, then, is whether the explanation proffered by Buck describes the true basis for Buck's employment decision, or whether the explanation provides simply a pretext for discrimination. The plaintiff, who retains the burden of persuasion throughout the case, may demonstrate that the explanation is pretextual in one of two ways: "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095.[7] Although the presumption of discrimination initially raised by the plaintiff's

prima facie showing is no longer in effect, the court may consider the evidence presented in the plaintiff's direct case, as well as any evidence presented on rebuttal, in determining whether he has demonstrated that the defendant's proffered explanation is pretextual. *Id.* at 255 n. 10, 101 S.Ct. at 1095 n. 10.

In light of all the evidence presented in the case, we conclude that Griffin has sustained his ultimate burden of establishing intentional discrimination by the second of the two methods mentioned above—namely, by showing that the explanations presented by Buck are not worthy of credence.

Turning first to the explanation that Westbrook perceived Griffin's salary expectations as a major obstacle to his employment with Buck, several factors prompt us to conclude that this explanation should not be credited. First, no mention of salary was made in the notes that Westbrook made on February 3, 1978 (Def. Ex. F), even though it is conceded that these notes were made precisely because of Westbrook's perception that there might be "problems" in the future with regard to Griffin's rejection. Nor was the salary issue raised in Buck's statement to the New York Human Rights Division, prepared by Westbrook and dated September 13, 1978 (Pl. Ex. 18). The record discloses that the first mention by Buck of Griffin's salary demands as a reason for his rejection was a letter dated March 25, 1980 by Buck's counsel to the state Human Rights Division (Def. Ex. Q). Westbrook concedes that, when he interviewed Griffin, he did not discuss Buck's salary structure with Griffin. Griffin's testimony on this issue—that he did not discuss the salary issue at all at the interview with Westbrook, and that Westbrook in fact informed him afterward that salary was not a reason for his decision—was credible.[8]

was hired on February 6, 1978, immediately after Griffin was rejected. Pl. Ex. 9.

**7.** The plaintiff is not required to show that race was the sole motivating reason for the employment decision; rather, the plaintiff establishes a violation of Title VII by showing that race

was a factor—a "but for" cause—in the decision. *McDonald v. Santa Fe Rail Transp.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2579 n. 10, 49 L.Ed.2d 493 (1976).

**8.** We have taken due note of the matters Buck brought forward in an attempt to impeach Grif-

For these reasons, we conclude that the first explanation offered by Buck is "unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095.[9]

We reach the same conclusion with respect to the second explanation offered by Buck. Although Westbrook emphasized in his testimony the "mundane" nature of the actuarial trainee position and the prime importance of an applicant's tolerance for drudgery, several factors raise a question whether this consideration prompted Griffin's rejection. If Buck had been seeking unskilled workers who were to be trained for purely clerical tasks, Griffin's qualifications would certainly be markedly incongruous with those required for the job, and Buck's explanation for his rejection might be difficult to refute. Westbrook's own testimony, however, established that Buck sought highly educated people for the actuarial trainee position. Applicants were required to have a college degree in math or a math-related field, and Buck sought applicants who had passed some of the actuarial exams, although applicants were regularly accepted who had not yet passed any. Additional academic work beyond the college level was also considered an advantage for applicants. For example, in explaining why the white person hired immediately after Griffin's rejection was given a starting salary higher than that warranted by Buck's salary chart (Def. Ex. G), Westbrook speculated, *inter alia,* that the individual may have had a master's degree. Such qualifications were apparently considered desirable in part because, notwithstanding the nature of a trainee's initial duties, Buck hoped to hire people who would eventually be promoted to the higher positions available at the firm. These circumstances warrant a fair degree of skepticism toward the explanation that Griffin was distinguishable from other candidates because of the possibility that he would be dissatisfied with a trainee's duties, particularly in light of Buck's failure to identify any specific applicant other than Griffin who was ever rejected because of Westbrook's (or any other interviewer's) perception that he or she was overqualified and would not be happy in the job.[10]

Moreover, despite the importance Westbrook states he attached to Griffin's willingness (or lack thereof) to perform mundane tasks for several years, and to Griffin's alleged statement that he thought he would complete the training period in a short time, Westbrook conceded that he did not ask Griffin at the interview whether he would be willing to spend the standard two to three years in the job.[11] Such matters

---

fin's credibility—for example, his failure to file income tax returns. While this matter is troubling on independent grounds, we find it to have a minimal impact on the credibility of Griffin's testimony in this case.

**9.** On direct examination of Westbrook, Buck's attorney asked Westbrook to state the qualifications required of an actuarial trainee. Westbrook proceeded to name four "qualifications"—that the individual possess a college degree in math, or at least a minor; that he be interested in the actuarial field; that he be interested in the position and willing to perform the duties involved; and that he be interested in the salary structure at Buck. These "qualifications," Westbrook conceded, were not reduced to writing in any form, a fact which diminishes their probative value in determining what uniform criteria, if any, Buck may have actually used in evaluating applicants.

**10.** Cf. *Robinson v. 12 Lofts Realty,* 610 F.2d 1032, 1040 & n. 13 (2d Cir.1979) (evidence in housing discrimination case that reasons offered to explain rejection of black applicant did not result in rejection of white candidates casts doubt on whether the proffered reasons actually prompted the rejection). Although the defendant of course bears no burden of persuasion, a defendant's demonstration that whites have been rejected for the reason relied on in rejecting a black applicant might well persuade a court that the plaintiff has not sustained his burden of proof; by the same token, the absence of such evidence may contribute to the conclusion that the plaintiff has presented the stronger case and has sustained his burden of proof. We therefore disagree with Buck's argument, contained in a letter submitted by counsel, that it was somehow incumbent upon Griffin to prove the negative proposition that no white applicants were rejected for the reasons advanced by Buck for Griffin's rejection.

**11.** We have already noted the inconsistencies in Westbrook's testimony on the length of the training period, *supra,* note 5.

may be taken into account in considering whether this second explanation relied upon by Westbrook had as much importance in the actual employment decision as Westbrook in hindsight now attaches to it.[12]

Finally, although Buck places great emphasis on the fact that Westbrook invited Griffin for an interview knowing he was black, and indeed took the unusual step of paying his expenses to New York, we do not find this to establish an automatic defense to a charge of employment discrimination, as Buck has appeared to argue at times. Of course, these facts weigh in Buck's favor; on the other hand, in view of the credentials Griffin presented in the resume he sent to Buck, a decision not to interview him would have been virtually inexplicable. The question is whether Buck, having interviewed Griffin, based its decision not to hire Griffin on the reasons it has proffered. In light of the credibility of Griffin's testimony, the various reasons that we find to question the dependability of Westbrook's testimony, and the evidence as a whole, we conclude that Griffin has carried his burden of discrediting the reasons Buck offers for his rejection, and thus in establishing intentional discrimination under Title VII.[13] We reserve decision on the question of damages pending further development of the parties' positions on the issue.

It is so ordered.

12. Although Westbrook did include in his February 3rd notes a statement concerning Griffin's unwillingness to carry out the mundane aspects of the job, these notes, as we have indicated, have limited probative value in light of the fact that they were prepared only after Sic had drawn Westbrook's attention to the possibility of litigation. This is true also of Westbrook's notes of his telephone conversation with Griffin.

13. Both sides have relied on circumstantial evidence regarding Buck's practices in hiring minorities; we find that the evidence does not provide strong support for either side's contentions. There are 5,000 actuaries in the United States, of whom only 0.2% are black. Of the approximately 220 actuarial trainees Buck hired between January 1975 and June 1982, 10, or about 4.5%, were black. (Pl.Ex. 9) (Buck has calculated this percentage as 4.6%.) Taking into account the employees that have left Buck during that time, there has been a net increase of 25 employees in actuarial positions, of whom one is black. Griffin relies on this latter statistic, along with the fact that eight of the ten blacks hired in all between 1975 and 1982 were hired only after Griffin had threatened legal action, to show that Buck, along with the rest of the industry, has an extremely poor record in hiring blacks. Although these figures are disturbingly low, their probative value is diminished by the lack of any evidence of the number of blacks with the relevant qualifications for actuarial positions at Buck.

Buck, for its part, takes a wholly untenable position with respect to these statistics. Buck argues that because blacks comprised 4.6% of those hired, and this figure is 23 times higher than the national percentage of black actuaries (0.2%), Buck has produced "conclusive proof" that it did not discriminate against Griffin because of his race. Leaving aside the fact that only two of these persons were hired before Griffin threatened legal action, proof that an employer does somewhat better than the industry as a whole in hiring blacks is hardly conclusive evidence that the employer did not discriminate against a particular individual. Buck's argument disingenuously invites the court to assume that the actuarial field's 0.2% figure is an appropriate figure against which to measure discrimination. Buck indulges in the same fiction by arguing that the one black represented in Buck's net increase of 25 employees from 1975 to 1982 proves that Buck does not discriminate because one out of 25 equals 4%, a figure which Buck proudly proclaims is 20 times higher than the industry-wide figure of 0.2%. Of course, such calculations have little significance when the underlying figures are as low as those involved here.